*I). BODY OF COMPLAINT ( NATURE OF SUIT.)*

**FILED**
UNITED STATES DISTRICT COURT
SANTA FE, NEW MEXICO

MAY 1 4 2020

**MITCHELL R. ELFERS**
CLERK

CV 20-472

*1). PERSONAL INJURY ( 365).   A.  FOOD FRAUD PARASITIC INFECTION FED. PROC. 1984 FEB;  43 (2) : 239 -45.*

*2). CONSTITUTIONALITY OF STATE STATUE (950).  THE NEW MEXICO STATUE OF LIMITATIONS. (ACTIONS MUST BE BROUGHT WITHIN 5-7 YEARS WITH FRAUD OR AN U.S. THREAT.)*

*3). PERSONAL PROPERITY ( 370).  OTHER FRAUD.  WRONGFUL DEATH OF A PET.  42 USC SS 1983.*

*II). LEGAL BASIS:*

*1).  THE UNITED STATES COURTHOUSE,  SANTIAGO E. CAMPOS.  THE U.S. DISTRICT COURT REPRESENTING THE CITIZENS OF NEW MEXICO;  AS A RESIDENT OF RIO ARRIBA COUNTY.  THIS COURT ENFORCES FEDERAL LAWS BY WAY OF THE ( UNITED STATES CODE SERVICE) IMPLEMENTING & ENACTING LAWS PASSED BY, THE U.S. HOUSE OF REPRESENTATIVES, 108TH CONGRESS, WASHINGTON, D.C./ UPON VIOLATION OF THESE FEDERAL LAWS SERVES AS LEGAL BASIS:  IN THE U. S. DISTRICT COURT SYSTEM, AS WELL AS,  THE N.M. SUPREME COURT SYSTEM.*

*(PAGE 1, OF 2 PAGES.)*

CONTINUED:

III). COURTS JURISDICTION:     UNITED STATES COURTHOUSE.
                               SANTIAGO E. CAMPOS,
                               106 S. FEDERAL PL.,
                               SANTA FE, N.M.
                               87501


   1). FEDERAL LAWS SET FORTH IN VIOLATION UNDER THE BEFORE MENTIONED PRINCIPALS, OR
FOUNDATIONS SET BY THE U.S. HOUSE OF REPRESENTATIVES, CONGRESS 108TH, WASHINGTON, D.C.
SPECIFICALLY IN THESE  INSTANCES: A).  PERSONAL INJURY (365). FOOD FRAUD PARASITIC INFECTION
FEDERAL PROC.  1984 FEB 43 (2)  :  239- 45 .  B).  CONSTITUTIONALITY OF STATE STATUES (950).  N.M.
STATUE OF LIMITATIONS/  ( ACTIONS HAVE A LIMIT OF 5-7 YEARS WHEN FRAUD IS INVOLVED, &
POSSIBILITIES OF AN NATIONAL THREAT.) C).  WRONGFUL DEATH OF A PET.  42 U.S.C SS 1983.  UPON
VIOLATION OF THESE LAWS SERVES AS JURIDICTION IN THIS U.S. DISTRICT COURT, AS WELL AS , THE
N.M. SUPREME COURT, SYSTEM.

*TABLE OF CONTENTS*

*I). BODY OF COMLAINT ( NATURE OF SUIT).*

*II). LEGAL BASIS.*

*III). COURTS JURISDICTION.*


*( EXHIBIT-1). NEW MEXICO STATUE OF LIMITATIONS.*

*( EXHIBIT-2). LETTER TO WALMART'S U.S. ( COMPLAINT.) DIV. (JANUARY 2020).*

*( EXHIBIT-3). 930. MAJOR FRAUD AGAINST THE U.S.*

*( EXHIBIT-4). REPLIES FROM WALMART'S CLAIM SERVICES: FEBRUARY 11, 2020.*
*FEBRUARY 18, 2020.*

*( EXHIBIT-5). LETTER TO THE U.S. COURTHOUSE. ( APRIL 21, 2020.)*
*SANTA FE COUNTY.*

*( EXHIBIT-6). 42 U.S.C. SS 1983 PET DAMAGES.*

*(EXHIBIT-7). Itemization of damages.*



**Call Us Toll Free** | Phones Answer 24/7

# 1-866-943-3427

Hablamos Español

# New Mexico Statute of Limitations

## Wrongful Death

A wrongful death action must be brought within three years of the date of death.

## Personal Injury Actions

Personal injury actions must be brought within three years of the date of the injury.
*PERSONAL INJURY MUST BE BROUGHT WITHIN 5-7 YEARS, [ USCO2] 21 USC CH.-9 : FEDERAL FOOD DRUGS, &...... FrAUD/O~.R.ж,*

## Actions Against the Government

An action brought against a government entity or public employee must be brought within two years from the date of injury or death, except a minor under the age of seven. He or she shall have until his or her ninth birthday to file suit.

## Medical Malpractice Actions

Actions against health care providers must be filed within three years of the date that the act giving rise to the injury occurred. Minors under the age of six have until their ninth birthday to file suit.

## Products Liability Actions

Products liability actions must be brought within three years af
years of the date that the plaintiff discovered, or should have di

## Special Rules for Minors

Except in cases of wrongful death or medical malpractice, min
birthday to file suit.



Workers' Compensation

Workers' Compensation

A workers' compensation claim must be filed within one year and 30 days of the date of injury.

**Need more information on state laws? Learn more about the laws where you live.**

*Note: Our attorneys are licensed to practice law in Pennsylvania, West Virginia, Ohio, Maryland, and Virginia. This information is not intended to solicit clients for matters outside of the states of Pennsylvania, Ohio, West Virginia, Maryland, and Virginia, although if you are injured in an accident, we have relationships with other personal injury attorneys and lawyers throughout the United States.*

Copyright 2002-2020. EdgarSnyder.com is sponsored by the Law Offices of Edgar Snyder & Associates®, a personal injury law firm representing people hurt in all types of accidents. The firm also represents injured workers as well as the victims of workplace discrimination and harassment. Attorney Edgar Snyder & Associates has offices throughout Western Pennsylvania including locations in: Pittsburgh, Erie, Johnstown, Ebensburg, and Altoona. All of our lawyers are licensed to practice law in the state of Pennsylvania. We also have attorneys licensed to practice law in the states of West Virginia, Ohio, Maryland, and Virginia. Although this website is not intended to solicit clients for matters outside of those states, if you are injured in an accident, we have relationships with other personal injury attorneys and lawyers throughout the United States.
Employee Login



JANUARY/2020

WALMART'S U.S. DIV.

702 S.W. 8th ST.

BENTONVILLE, AR. 72716

CEO. GREGORY FORAN

DEAR MADAME, OR SIRS,


   APPROXIMATELY 1 1/2 YEAR AGO, I SENT A COMPLAINT & PICTURES CONCERNING FOOD
POISONING/ AGAINST GREAT VALUE TURKEY $350,000.00;  THIS COMPLAINT WAS REPLIED TO &PAID
EXPEDITIOUSLY, BY WAY OF A POST CARD WITH AN ADDRESS HEADED /FIRE INSURANCE.
UNFORTUNATELY,  I MISTOOK THAT POSTCARD AS JUNK MAIL FOR SOME TIME. AFTER REVELATION, I
CALLED THE TELEPHONE NUMBER ON THE CARD TO FIND THAT THERE WAS A DALLAS, TEXAS/
RECEPTIONIST WHO CLAIMED THAT TIME WAS UP AFTER 1 MONTH TO MAKE MY CLAIM.  I REALLY
WANTED TO SETTLE THIS COMPLAINT OUT OF COURT, ASIDE FROM THAT INCIDENT I WAS  JUST A
PERFECTLY SATISFIED CUSTOMER.  THE STATUE OF LIMITATIONS PROVIDES 3 YEARS BEFORE A CASE IS
RENDERED UNTIMELY.  KINDLY REMITT THAT PAYMENT VOUCHER FROM FIRE INSURANCE, OR
ANYWHERE, I WOULD  APPRECIATE IT IMMENSELY & WILL BE LOOKING OUT FOR IT.



ANTHONY R.HICKS                                    SINCERELY & TRULY,

P.O. BOX # 53,

EMBUDO, N.M.

TELEPHONE # (505) 423-7160                         ANTHONY R. HICKS

 An official website of the United States government
Here's how you know

THE UNITED STATES
DEPARTMENT of JUSTICE
ARCHIVES

This is archived content from the U.S. Department of Justice website. The information here may be outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive site.

# 930. MAJOR FRAUD AGAINST THE U.S.

The Major Fraud Act of 1988 (Pub.L. No. 100-700, § 2, 102 Stat. 4631) created a new offense, 18 U.S.C. § 1031:

  a. Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent --

  1. to defraud the United States; or
  2. to obtain money or property by means of false or fraudulent pretenses, representations, or promises, in any procurement of property or services as a prime contractor with the United States or as a subcontractor or supplier on a contract in which there is a prime contract with the United States, if the value of the contract, subcontract, or any constituent part thereof, for such property or services is $1,000,000 or more . . . .

The statute has been upheld against vagueness attacks. *United States v. Nadi*, 996 F.2d 548 (2d Cir. 1993), *cert. denied*, 114 S. Ct. 347 (1993); *United States v. Frequency Electronics*, 862 F. Supp. 834 (E.D.N.Y. 1994). For more on the Act, see S. MacKay, *The Major Fraud Act After Seven Years: an Update*, 64 Federal Contracts Report 1 (Sept. 25, 1995, Bureau of National Affairs). The Criminal Division's Fraud Section Federal Procurement Fraud Unit also has prepared a monograph on the Act, as well as a sample indictment.

The Act also establishes a "bounty-hunter" provision under 18 U.S.C.§ 1031(g), which allows payments from the Department of Justice to persons who furnish information under the Act; however, to date, no fund has been authorized and no payments awarded.

[cited in JM 9-42.001]

‹ 929. Obstruction of Federal Audit                    up                    931. Department of Defense Voluntary Disclosure Program ›

*Updated January 21, 2020*

arrangements under the anti-kickback statute. In addition, the HHS-OIG periodically issues Special Fraud Alerts that serve to give continuing guidance to health care providers on various aspects of the anti-kickback statute and other statutory provisions. Finally, HHS is now required, in consultation with the Department of Justice, to provide formal written advisory opinions to the provider community on the application of the anti-kickback statute, the safe harbor provisions, and certain other HHS health care fraud and abuse sanctions.

## B. Safe Harbors

### 1. Annual Solicitation

HHS will publish a solicitation in the Federal Register on or about January 1 of each year, with a 60-day response period, for proposals to modify existing safe harbors, or for new safe harbors. After considering such proposals, HHS may publish a notice of proposed rulemaking, with modifications to existing safe harbors and with new safe harbors, for public comment. If HHS elects not to respond to a safe harbor proposal in this manner, the HHS-OIG will report to Congress regarding the reasons for rejection of each such proposal.

### 2. Criteria

In modifying existing safe harbors or establishing new ones, HHS may consider whether the practice may result in an increase or decrease in (1) access to health care services, (2) quality of health care services, (3) patient freedom of choice among health care providers, (4) competition among health care providers, (5) ability of health care facilities to provide services in medically underserved areas or to medically underserved populations, (6) cost to Fedral health care programs, (7) potential overutilization of health care services, and other factors.

## C. Special Fraud Alerts

### 1. Annual Solicitation

HHS will publish a solicitation in the Federal Register on or about January 1 of each year, with a 60-day response period, for proposals for Special Fraud Alerts. In addition, HHS-OIG will accept proposals for Special Fraud Alerts at any time. After considering such proposals, HHS-OIG may publish Special Fraud Alerts, if appropriate.

### 2. HHS-OIG Initiative

The HHS-OIG will, on its own initiative, continue to regularly assess information generated through audits, investigations and evaluations to determine whether a Special Fraud Alert is warranted to address particular conduct.

### 3. Criteria

In evaluating whether to issue a particular fraud alert, HHS-OIG may consider the volume and frequency of the conduct that is in question, as well as any of the factors discussed above with respect to safe harbors.

## D. Advisory Opinions

### 1. Subjects of Advisory Opinions.

In consultation with the Department of Justice, HHS-OIG will issue written advisory opinions with regard to: (1) what constitutes prohibited remuneration under the anti-kickback statute; (2) whether an arrangement, or proposed arrangement satisfies the criteria in section 1128B(b)(3) of the Social Security Act (the Act), or established regulations, for activities that do not result in prohibited remuneration; (3) what constitutes an inducement to reduce or limit services under section 1128A(b) of the Act to Medicare and Medicaid beneficiaries; or (4) whether an activity, or proposed activity, constitutes grounds for the imposition of civil or criminal sanctions under sections 1128, 1128A or 1128B of the Act. The HHS-OIG will

not address the issues of whether fair market value shall be, or was paid for any goods, services or property, or whether an individual is a bona fide employee.

2. Final Rule

HHS is required to have procedural regulations set in place by February 17, 1997, as the statute requires HHS to accept requests for formal advisory opinions from outside parties on or after February 21, 1997. This rule will serve to address the various procedural issues and aspects of this advisory opinion process. Specifically, this rule will set forth: (1) the procedures to be followed by a party applying for advisory opinions and by the HHS-OIG in responding to these requests; (2) the time frames under which the HHS-OIG will receive and respond to requests; (3) the type and amount of fees to be charged to the requesting party; and (4) the manner in which the public will be informed of the issuance of any advisory opinion. The rule will not address the substance or content of advisory opinions to be issued by the HHS-OIG.

3. Fees

In accordance with the statute, HHS-OIG will charge a fee to the requestor - payable to the U.S. Treasury - equal to the costs incurred by the Department of Health and Human Services in responding to the request.

4. Dissemination of advisory opinions

Once HHS-OIG issues an advisory opinion to a requestor, HHS-OIG will also make copies available for public inspection and on the HHS-OIG web site.

E. **The Department of Justice and the Department of Health and Human Services will work with other law enforcement officials engaged in health care enforcement to develop additional guidance such as fraud alerts with respect to fraudulent practices which also affect public and private health plans, other than medicare and medicaid.**

# V. ESTABLISH A NATIONAL DATA BANK TO RECEIVE AND REPORT FINAL ADVERSE ACTIONS AGAINST HEALTH CARE PROVIDERS

A. **General**

The Adverse Action Data Bank will be operated under the auspices of HHS, either directly or through contracts or other arrangements. Consideration will be given to security and integrity of the system, efficiency and cost.

B. **Security and Integrity**

1. There will be mechanisms in place to ensure the accuracy of reported information, including procedures to correct erroneous information.

2. There will be effective security to prevent unauthorized access to the data, including procedures for verifying the identities of those making requests for information from the Adverse Action Data Bank. There will be procedures to protect the confidentiality of individual patient information reported to and stored in the Adverse Action Data Bank.

C. **Efficiency of Operation**

1. To promote an efficient system, there will be coordination with the existing National Practitioner Data Bank to avoid duplication of expense and effort.

2. The Adverse Action Data Bank should be monitored to ensure that covered information is properly and timely reported.

3. In order to minimize expense and maximize timeliness of responses, electronic reporting and retrieval will be encouraged.

    4. There should be consideration of direct, on-line access by certain authorized users, if that access can be accomplished without compromising security concerns.

D. **Issues Relating to Cost**

Appropriate user fees, designed to cover the costs of operation, will be established.


# VI. COORDINATION AND EXCHANGE OF INFORMATION

In order to facilitate the enforcement of civil, criminal, and administrative statutes relating to fraud and abuse with respect to health plans, the following guidelines are provided to facilitate the exchange of information under the Program:

A. Guidelines for Exchange of Information

1. Health Plan Exchange of Information with Law Enforcement and Other Health Plans

Each health plan should establish policies to assure that relevant information is promptly provided to appropriate Federal, state and local law enforcement authorities and to other appropriate health plans such as

a. information indicating a potential violation of civil, criminal, or administrative laws relating to fraud and abuse with respect to health plans.

b. information requested by Federal, state, or local law enforcement agencies which the agency states is relevant to an investigation, audit, evaluation, or inspection under the Program.

c. information which would assist in the identification of potential violations or assist in the identification of areas requiring investigation, audit, evaluation, or inspection. Such information may include: 1) surveys; 2) quality assurance reviews; 3) provider and patient profiles; 4) utilization reviews, and 5) other similar analyses.

2. **Law Enforcement Exchange of Information With Health Plans**

Each Federal, state, and local law enforcement agency acting pursuant to the Program, should establish policies for the exchange of the following categories of information with health plans, to the extent such exchange is permitted by law and where disclosure would not jeopardize ongoing law enforcement activities:

a. information, the disclosure of which would further an investigation, audit, or evaluation;

b. information such as studies, evaluations, or profiles, which could assist health plans in establishing and maintaining appropriate controls;

c. information or evidence discovered in the course of an investigation or an administrative, civil or criminal proceeding conducted in conjunction with the Program, including periodic updates on the status of the investigation or administrative, civil or criminal proceedings;

d. information to be conveyed to victims of crime as set forth in applicable federal or state statutes, Attorney General Guidelines for Victim and Witness Assistance, and other relevant guidance including various notice and consultation provisions; and

e. information discovered in the course of an investigation or an administrative, civil or criminal proceeding which indicates an ongoing quality of care problem; this information should be shared with the health plan and any appropriate oversight agencies.

3. **Law Enforcement Exchange of Information with Other Law Enforcement Agencies**

Each Federal, state, and local law enforcement agency acting pursuant to the program, should establish policies to assure that the following information is promptly provided to other appropriate law enforcement agencies:

> a. information indicating a potential violation of civil, criminal, or administrative laws relating to fraud and abuse with respect to health plans or information which is relevant and would further an existing investigation of such potential violation.

> b. information, such as studies, reviews, profiles, which would assist an agency in identifying fraud and abuse.

### 4. Law Enforcement Treatment of Information Provided by a Health Plan

Each Federal, state, and local law enforcement agency responsible for the enforcement of laws relating to the Program, should establish policies which, where appropriate and otherwise permitted by law, provide that the agency may exercise its discretion to classify information obtained from health plans as confidential source information.

### 5. Information Exchange Coordinators

Each Federal, state, and local law enforcement agency, and each health plan, should designate an information coordinator or coordinators to act as the point of contact to facilitate exchanges of information under these guidelines. Each coordinator will be responsible for overseeing the exchanges of information described in these guidelines.

Each coordinator will be responsible for:

> a. identifying potential exchanges of information between that law enforcement agency, health plans and other agencies which would further the purposes of the program and not jeopardize on-going law enforcement activities.

> b. taking necessary steps to ensure that the Privacy Act, the Substance Abuse Patient Medical Records Confidentiality Act, and any other relevant confidentiality restrictions are not violated.

> c. where health plans are required to make information available to an agency (e.g., information relating to the payment of claims under the Medicare program, information subject to administrative subpoena) coordinating the disclosure of such information to assure that all relevant information is expeditiously disclosed.

> d. discretionary disclosures by health plans to federal law enforcement agencies, identifying information which the law enforcement agency needs from the health plans for investigative, audit, evaluation, or inspection purposes and establishing procedures and cooperative arrangements to obtain access to such information.

> e. coordinating with the health plans to identify categories of information in the private sector which could facilitate the identification of potential violations or assist in the identification of areas requiring investigation, audit, evaluation, or inspection.

> f. developing guidance on the reporting of information discovered in the course of an investigation or an administrative, civil or criminal proceeding which indicates an ongoing quality of care problem to health plans and any appropriate oversight agencies.

B. **Representatives of the Secretary of HHS (acting through the Inspector General) and the Attorney General will coordinate efforts to facilitate exchanges of information under these guidelines. This coordination will include the creation of a working group to address further sharing of data issues.**

## VII. HEALTH CARE FRAUD AND ABUSE CONTROL PROGRAM CONFIDENTIALITY PROCEDURES: PROVISION AND USE OF INFORMATION AND DATA

A. **General:** These guidelines shall apply to information, containing the identity of individuals receiving health care services or items, which is disclosed by health plans, providers and others to Federal, state and local law enforcement programs in connection with investigations, audits, evaluations and inspections relating to the delivery of and payment for health care services or items, conducted pursuant to the Fraud and Abuse Control Program.

B. **Scope:** The scope of these guidelines is limited to the maintenance of confidentiality of information and privacy of individuals receiving health care services and items. These guidelines are not intended to expand or narrow the use of such information for purposes of law enforcement, which is otherwise authorized or prohibited under law. These guidelines are not intended to expand or narrow any confidentiality, disclosure or privacy requirements under law, including, but not limited to the Substance Abuse Patient Medical Records Privacy Act, 42 U.S.C. § 290dd-2, and regulations, 42 C.F.R. Part 2; and the federal Privacy Act, 5 U.S.C. §552a.

C. **Procedures:**

1. Such information shall be provided in a manner, determined by the law enforcement agency which requested the information or to which the information is directed, that appropriately maintains the confidentiality of the information and privacy of individuals receiving health care services and items, to the extent practicable and consistent with the goals and purposes of the fraud and abuse control programs and legitimate law enforcement needs.

2. Such information should be maintained securely and access to such information should be limited to those persons with a legitimate need for access.

3. To the extent it is necessary to share such information with an expert, witness or consultant, to the extent practicable and consistent with the legitimate needs of law enforcement, the identity of individuals who have received health care services or items should be redacted. To the extent it is necessary to disclose the identity of such individuals, such experts, consultants or witnesses should be advised of the need to maintain the confidentiality of the information and the privacy of individuals who have received health care services or items. In those instances where law enforcement enters into a contract with expert witnesses or consultants to whom information subject to these guidelines will be disclosed, these guidelines should be incorporated within the contract language for the witness' or consultant's services.

4. The disclosure and use of such information in any judicial, administrative, court or other public proceeding should be undertaken in such a manner as to preserve the confidentiality and privacy of individuals who received health care services or items, unless disclosure is required by the nature of the proceeding. Whenever disclosure of these individuals' identities is required by the nature of the proceeding, or it is impracticable to redact the identities of such individuals, the attorney for the government should consider obtaining consent for the disclosure from the affected individuals, or making a request to the presiding judicial or administrative officer to enter an order limiting the disclosure of the identities of such individuals contained in such information, to the extent possible, including the redacting of the identities of individuals from publicly disclosed or filed pleadings or records.

5. Whenever the need for disclosed information subject to these guidelines has ended, such information should either be destroyed, or returned to the entity which originally disclosed it.

FN 1. This amount includes criminal fines and penalties, forfeitures, civil judgments and settlements, and administrative monetary penalties. It does not include the restitution due to the victim, funds awarded to a relator, or as otherwise authorized by law.

[updated April 1998] [cited in JM 9-44.150; JM 9-44.160]

‹ 977. Investigative Agencies                    up



An official website of the United States government
Here's how you know

THE UNITED STATES
DEPARTMENT of JUSTICE
ARCHIVES

This is archived content from the U.S. Department of Justice website. The information here may be outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive site.

# 978. HEALTH CARE FRAUD AND ABUSE CONTROL PROGRAM AND GUIDELINES

AS MANDATED BY THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996

Approved by:

Janet Reno, Attorney General, and Donna Shalala, Secretary, Department of Health and Human Services

Effective January 1, 1997

Introduction

Statement of Program Goals

Funding

Evaluation

Revisions

Definitions

I.   COORDINATE FEDERAL, STATE, AND LOCAL LAW ENFORCEMENT PROGRAMS TO CONTROL FRAUD AND ABUSE WITH RESPECT TO HEALTH PLANS

II.  CONDUCT INVESTIGATIONS, AUDITS, EVALUATIONS AND INSPECTIONS RELATING TO THE DELIVERY OF AND PAYMENT OF HEALTH CARE IN THE UNITED STATES

III. FACILITATE THE ENFORCEMENT OF THE CIVIL, CRIMINAL AND ADMINISTRATIVE STATUTES APPLICABLE TO HEALTH CARE

IV.  PROVIDE INDUSTRY GUIDANCE, INCLUDING ADVISORY OPINIONS, SAFE HARBORS, AND SPECIAL FRAUD ALERTS RELATING TO FRAUDULENT HEALTH CARE PRACTICES

V.   ESTABLISH A NATIONAL DATA BANK TO RECEIVE AND REPORT FINAL ADVERSE ACTIONS AGAINST HEALTH CARE PROVIDERS

VI.  COORDINATION AND EXCHANGE OF INFORMATION

VII. HEALTH CARE FRAUD AND ABUSE CONTROL PROGRAM CONFIDENTIALITY PROCEDURES: PROVISION AND USE OF INFORMATION AND DATA

**Introduction:** The Health Insurance Portability and Accountability Act of 1996 establishes and funds a program to combat fraud and abuse committed against all health plans, both public and private. This legislation requires the Attorney General and the Secretary of Health and Human Services ("Secretary") to establish a Health Care Fraud and Abuse Control Program within the specific parameters set forth by the statute. Under the joint direction of the Attorney

General and the Secretary (acting through the agency's Inspector General ("HHS-OIG")), the Health Care Fraud and Abuse Control Program is to achieve the following goals:

1. Coordinate Federal, State, and local law enforcement programs to control fraud and abuse with respect to health plans;

2. Conduct investigations, audits, evaluations, and inspections relating to the delivery of and payment for health care in the United States;

3. Facilitate the enforcement of the civil, criminal and administrative statutes applicable to health care;

4. Provide industry guidance, including advisory opinions, safe harbors, and special fraud alerts relating to fraudulent health care practices; and

5. Establish a national data bank to receive and report final adverse actions against health care providers.

To fund the program, the Act directs that an amount equalling recoveries from health care fraud investigations[FN1] be deposited in or transferred to the Federal Hospital Insurance Trust Fund ("Trust Fund"). Monies are then appropriated from the Trust Fund to a newly-created expenditure account, called the Health Care Fraud and Abuse Control Account ("Control Account"), in an amount the Attorney General and Secretary jointly certify are necessary to finance anti-fraud activities. Certain of these sums are available only for "activities of the Office of the Inspector General (OIG) of the Department of Health and Human Services, with respect to Medicare and Medicaid programs." To the extent that funds are not spent directly by the Departments of Health and Human Services and Justice on the establishment and operation of the Program, Control Account funds may be made available to others engaged in health care fraud control for purposes in furtherance of the Program.

In addition to establishing the Program, (as set forth in this overview), the Act directs the Attorney General and the Secretary to issue joint guidelines to carry out the Fraud and Abuse Control Program, including guidelines on the collection of information from health plans, and the preservation of the confidentiality of that information.

## Statement of Program Goals

The overall goal of the Health Care Fraud and Abuse Program is to further enable the identification, investigation and, where appropriate, prosecution of those individuals and entities who commit fraud against the nation's health care delivery system. Also, the Program is to alert the public, service providers, industry groups, and consumers to such schemes; to identify systemic problems that permit fraud and abuse to occur and correct such vulnerabilities; to safeguard the confidentiality of health care information that is gathered for these law enforcement purposes; to educate consumers with the goal of preventing fraud and abuse; and to furnish the industry with guidance concerning permissible business practices arising from the provision of health care services and equipment.

Specifically, the goals of the Program are as follows:

1. **Coordinate Federal, State and local law enforcement programs to control fraud and abuse with respect to public and private health plans.**

   There are a wide range of entities at the federal, state and local levels responsible for enforcing the laws and regulations prohibiting fraud and abuse by the health care industry. These entities include criminal and civil prosecutors at the federal level, state prosecutors and Medicaid Fraud Control Units, to local prosecuting attorneys, regulatory agencies and licensing boards. While these entities may have jurisdiction over varying legal proscriptions, in the context of fraud against public or private health plans, they share one common goal: to detect and eliminate fraud and abuse by the health care industry.

   The program strives to maximize the effectiveness of these law enforcement programs by ensuring that there is both (1) adequate coordination on issues concerning enforcement policy as well as (2) appropriate sharing of information among law enforcement entities about specific law enforcement efforts. To these ends, the Attorney General and the Secretary shall establish specific guidelines to promote this coordination and shared information.

2. **Conduct investigations, audits, evaluations and inspections relating to the delivery of and payment for health care in the United States.**

The heart of the law enforcement effort is the fact-gathering that must occur in the investigative and audit stage of each case. In addition, fact-gathering is important in the regulatory oversight of the various agencies which have jurisdiction over segments of the health care industry. Law enforcement as well as regulatory agencies at the federal, state and local levels are charged with the responsibility to conduct investigation, audits and inspections and to utilize the tools at their disposal to undertake these responsibilities.

The program's mission is to encourage and to maximize the ability to conduct fact-gathering by both law enforcement and regulatory agencies by ensuring that methods are understood by those responsible for these tasks, to provide guidance on how to maximize the effectiveness of these tools, to encourage the sharing of information among those responsible for fact-gathering and to set forth other guidelines that will ensure that investigations, audits, evaluations and inspections are conducted in a timely and efficient manner.

3. **Facilitate the enforcement of the civil, criminal and administrative statutes applicable to health care.**

Essential to the mission of the fraud and abuse control program is enforcement of existing statutes relating to fraud and abuse by the public and private health care sectors. While criminal statutes have as their purpose punishment and deterrence, civil statutes focus on returning monies lost to fraud to those defrauded, stopping the fraudulent conduct through injunctive means, and imposing monetary penalties. Administrative sanctions similarly may be used to impose civil monetary penalties, to prohibit those who have engaged in fraud or other wrongdoing from receiving further funds, and to ensure future compliance with the law.

The use of these remedies in a coordinated fashion is an essential element of the fraud and abuse control program. By using all the government's complementary remedies, law enforcement both ensures that all aspects of fraudulent conduct are addressed, and sends a clear message to the health care industry that fraudulent conduct will not be tolerated. Also, by punishing the past conduct and recovering wrongfully obtained funds, and then addressing potential future misconduct by ensuring long term compliance, law enforcement furthers another critical mission of the program: prevention of fraud and abuse.

An important element of promoting effective enforcement of the statutes applicable to health care is education and training of health care professionals and others -- including patients and their families -- about fraud and abuse.

4. **Provide industry guidance, including advisory opinions, safe harbors, and special fraud alerts relating to fraudulent health care practices.**

Prior to the passage of the Health Insurance Portability and Accountability Act of 1996, the HHS-OIG offered advice to the public with respect to the Medicare and Medicaid Anti-Kickback statute, 42 U.S.C. 1320a-7b(b), in the form of "safe harbor" regulations and Special Fraud Alerts. The safe harbor regulations specify particular lawful practices which are not subject to enforcement action under the Anti-kickback Statute. HHS-OIG also has published Special Fraud Alerts, which are intended to put the public on notice that the HHS-OIG considers particular practices violative of the law.

Section 205 of the Health Insurance Portability and Accountability Act requires the HHS-OIG to solicit on an annual basis, in a *Federal Register* notice, proposals for (1) modifications to existing safe harbors, (2) additional safe harbors, and (3) special fraud alerts. HHS-OIG will evaluate each proposal received relating to safe harbors, and will respond either by proposing a new or modified safe harbor, or specify in a report to Congress why a proposal was rejected. OIG will also evaluate each proposal received relating to Special Fraud Alerts and will respond by publishing a fraud alert, if appropriate.

In addition, the Department of Health and Human Services (in consultation with the Department of Justice) is now required to provide formal written advisory opinions to the public on the application of the anti-kickback statute, the safe harbor provisions and the other HHS-OIG health care fraud and abuse sanctions found in Section 1128, 1128A and 1128B of the Social Security Act. While the safe harbors and Special Fraud Alerts

address hypothetical or generalized fact patterns, advisory opinions address particular factual circumstances of particular parties.

Generally, Section 1128 contains the bases for exclusion of a party from the Medicare and Medicaid programs, and by operation of law, from all federal procurement and non-procurement programs. Section 1128A contains the Civil Monetary Penalty law, which proscribes penalties and assessments for claims to Medicare and Medicaid which are false, fraudulent, or otherwise not provided as claimed. Section 1128B contains criminal provisions specifically directed to Medicare and Medicaid, such as false claims and the prohibition on offering to pay or receive kickbacks.

The purpose of these industry guidance provisions is to provide meaningful guidance principally to the health care provider community with respect to what conduct is lawful and unlawful under these statutes. However, it is also important that the process and content of the guidance not create obstacles to the prosecution of those who have violated the law. In his statement at the time of signing Pub.L. 104-191, the President specifically cited the concerns of the Secretary of HHS and the Attorney General, that "advisory opinions [relating to criminal statutes] could create complexities that would burden the efforts to enforce laws against health care fraud and abuse." As a result, the President directed the Departments of HHS and Justice, "to work closely together in implementing this provision to ensure that it promotes and protects Federal law enforcement activities relating to health care fraud."

5. **Establish a national data bank to receive and report final adverse actions against health care providers.**

The final mission of the Program is to establish a network of information designed to facilitate the sharing of information with interested parties regarding adverse actions taken against providers. Shared information in this regard will be beneficial to law enforcement, and others as well as those agencies at the federal, state, and local level who regulate the provider community. Guidelines will be implemented to ensure that timely, accurate information is collected by the adverse action data bank and that authorized entities may quickly and easily obtain this information.

## FUNDING

Control Account funds are provided by the Act to cover costs (including equipment, salaries and benefits, and travel and training) of the administration and operation of the Program, including the costs of:

- prosecuting health care matters (through criminal, civil, and administrative proceedings);
- investigations;
- financial and performance audits of health care programs and operations;
- inspections and other evaluations; and
- provider and consumer education regarding compliance with the provisions of title XI.

## EVALUATION

Annually the Department of Justice and the Department of Health and Human Services will assess the effectiveness of the Program in combatting health care fraud and abuse. This assessment will include factors such as the appropriateness of the program's goals and objectives, the performance of the organizations which receive funds from the Account, and possible new areas to direct resources.

## REVISIONS

This Program statement and accompanying Guidelines may be modified, as appropriate, upon agreement of the Attorney General and the Secretary.

NOTE: Neither the Health Care Fraud and Abuse Control Program nor these guidelines create any rights, privileges or benefits, either substantive or procedural, enforceable at law by any person in any administrative, civil or criminal

matter; nor do they limit any rights, privileges, or benefits the Department of Justice and Health and Human Services may assert in such matters.

## Definitions

The following acronyms and definitions are used herein:

- "AG" shall mean the Attorney General of the United States.

- "AOA" shall mean the United States Administration on Aging within the Department of Health and Human Services

- "CHAMPUS" shall mean the Civilian Health and Medical Program of the Uniformed Services.

- "DCAA" shall mean the Defense Contract Audit Agency of the United States Department of Defense.

- "DCIS" shall mean the Defense Criminal Investigative Service of the United States Department of Defense.

- "DOJ" shall mean the United States Department of Justice, including its litigating Divisions and the Offices of the United States Attorneys.

- "DOL" shall mean the United States Department of Labor.

- "DOL-OIG" shall mean the Inspector General of the United States Department of Labor.

- "FBI" shall mean the Federal Bureau of Investigation of the United States Department of Justice.

- "FEHBP" shall mean the United States Federal Employees Health Benefits Program, administered by the Office of Personnel Management.

- "HCFA" shall mean the United States Health Care Financing Administration.

- "HHS" shall mean the United States Department of Health and Human Services.

- "HHS-OIG" shall mean the Inspector General of the United States Department of Health and Human Services.

- "OPM" shall mean the United States Office of Personnel Management.

- "OPM-IG" shall mean the Inspector General of the Office of Personnel Management.

- "VA" shall mean the United States Department of Veterans Affairs.

- "VA-IG" shall mean the Inspector General of the United States Department of Veterans Affairs.

- "The Act" shall mean the Health Insurance Portability and Accountability Act of 1996.

- "The Program" shall mean the Fraud and Abuse Control Program, as mandated by the Act.

- "The Secretary" shall mean the Secretary of the United States Department of Health and Human Services.

# I. COORDINATE FEDERAL, STATE, AND LOCAL LAW ENFORCEMENT PROGRAMS TO CONTROL FRAUD AND ABUSE WITH RESPECT TO HEALTH PLANS

### A. General

1. Health care fraud and abuse control is promoted when Federal, State, and local law enforcement entities share information about trends in health care fraud, emerging investigative and prosecutorial techniques, and other information necessary to achieve the common goal of controlling health care fraud.

2. Health care fraud and abuse control is promoted when Federal, State, and local law enforcement coordinate and communicate with respect to specific law enforcement initiatives.

## B. Means

1. Opportunities at the national, State, and local levels should exist or be established to enable all interested Federal, State, and local law enforcement entities, both investigative and prosecutive, to share periodically information about trends in health care fraud and emerging investigative and prosecutorial techniques, applicable statutes and regulations, and to coordinate and communicate with respect to specific law enforcement initiatives. Federal, State, and local law enforcement can explore the development and sharing of appropriate data bases. It is the expectation that the United States Attorneys will act in a leadership role in the establishment and operation of this coordination and communication at the district level.

2. These opportunities may include periodic meetings, newsletters, exchange of information, liaisons with other groups, and working groups.

## C. National Efforts

1. At the national level, the Executive Level Health Care Fraud Policy Group, the National Health Care Fraud Working Group, and the Inspector General Health Care Fraud Coordinating Council, are existing groups that serve the goal of coordination. Those bodies should continue to meet on a regular basis.

2. The Executive Level Health Care Fraud Policy Group is composed of representatives of the Department of Justice (criminal and civil prosecutors and Federal Bureau of Investigations); HHS OIG; and HCFA as appropriate. In addition, this group will meet at least semi-annually with representatives of other federal and state law enforcement agencies engaged in health care fraud control and as appropriate, associations such as the National Association of Attorneys General and National Association of District Attorneys.

3. The Executive Level Health Care Fraud Policy Group will provide national leadership in coordinating various activities which may include:

   a. Establishment of working groups to examine particular areas of the health care industry or issues in order to develop recommendations on enforcement policy. For example, the Managed Care Working Group has been established and should continue to address issues of importance in the managed care arena, such as methods of obtaining and analyzing managed care encounter data, considering audit protocols, examining legislative issues relevant to enforcement in this area, and development adequate training for law enforcement authorities and managed care administrators.

   b. Identification of trends of fraudulent activity which warrant intensified enforcement scrutiny, and where appropriate, will facilitate a coordinated enforcement effort. Trends in fraudulent activity will be developed through an analysis of changes in health care billing, expenditures and/or spending, and other appropriate factors. As appropriate, the coordinated enforcement effort will be developed in conjunction with federal, state and local law enforcement and health care program agencies.

   c. Monitoring of information concerning expected future trends in health care fraud and abuse involving public and private health plans and disseminating this information to federal, state, and local law enforcement, and to public and private health care program agencies.

   d. Development of a mechanism for identifying information concerning payment or record keeping policies, structures or practices which render a health care plan (public or private) vulnerable to fraud and abuse. All law enforcement authorities should be encouraged to use this mechanism to report systemic vulnerabilities which they recognize in the course of their investigations. At the national level, these reports will be compiled by HHS-OIG and transmitted to the specified health care plans so that corrective action may be taken.

    e. Development of a policy statement concerning the need to, consistent with existing law, refer investigative product to state licensing and regulatory bodies, so that appropriate administrative action may be taken.

    f. Facilitation of a coordinated training effort

        1. for federal, state and local agencies in the following areas: law enforcement techniques, full range of federal, state and local remedies, including licensure and regulatory action, best practices guides and corporate compliance plans.

        2. for health professionals and consumers on identifying and reporting fraud and abuse

        3. Appropriate opportunities at the national level should be devised to coordinate and enhance the efforts of nongovernmental individuals and entities in combatting health care fraud. This group or groups consisting of insurers, providers, consumers, and others, will meet at least semi-annually to identify and address opportunities to combat health care fraud.

D. **Efforts at the state and local level.**

    1. Numerous regional, state, or local health care fraud task forces/working groups presently exist; where they do not presently exist, they should be established. They serve the purposes of improving health care fraud enforcement by encouraging communication and coordination among law enforcement officials in the sharing of information on health care fraud and the use of criminal, civil, and/or administrative remedies. Successful resolution of these cases and operation of the task forces depends on mutual cooperation. In order to assist enforcement agencies in setting up such a task force, or in improving the operation of an existing task force, the Department of Justice will prepare descriptions of model task forces.

    2. Health care fraud task forces should include any federal, state, or local law enforcement agency indicating an interest in participation.

    3. Health care fraud task forces should establish a liaison with licensing and regulatory bodies at the state level and should, consistent with law, share information concerning fraudulent or abusive conduct by providers with these bodies.

    4. Health care fraud task forces should institute a channel of communication with private entities such as private insurers, provider groups, and consumer groups, in an effort to identify specific fraudulent activity, share information on fraudulent schemes, strengthen investigative techniques, and to encourage the referral of information about such activity to the health care fraud task force.

## II. CONDUCT INVESTIGATIONS, AUDITS, EVALUATIONS AND INSPECTIONS RELATING TO THE DELIVERY OF AND PAYMENT OF HEALTH CARE IN THE UNITED STATES

A. **General** The Program will encourage a coordinated and focused approach to investigations, audits, evaluations and inspections. To effectuate this focused and coordinated approach, the Program encourages the following:

    1. Coordination and cooperation between investigative agencies, auditors, prosecutors, other government attorneys with responsibilities under the Program, and persons conducting evaluations and/or inspections of providers and suppliers;

    2. Coordinated, multi-agency investigations whenever appropriate;

    3. Coordination with health plan administrators and officials;

    4. Development by investigative agencies and auditors of focused, in-depth knowledge of specific marketplaces and provider and supplier characteristics;

5. Provision of recommendations for program improvements to deter future fraud;

6. Increased involvement of private health plans in developing cases for prosecution by federal and state prosecutors;

7. Heightened scrutiny of identified sectors of the health care industry; and

8. Participation in national projects in areas which receive law enforcement priority.

B. **Investigative Organizations**

1. *Federal Investigative Agencies:* At the federal level, there are numerous law enforcement agencies with authority to investigate health care fraud including those listed below. The description of the primary responsibility of each agency to investigate fraud on particular health care programs shall not be interpreted to exclude any federal investigative agency with jurisdiction from investigating fraud on any other health care program. The Program encourages greater coordination among law enforcement agencies, including investigations which cross jurisdictional boundaries of the law enforcement agencies described.

   a. The Department of Health and Human Services Office of Inspector General (HHS-OIG) focuses primarily on fraud on the Medicare and Medicaid programs and the health benefits programs of the United States Public Health Service (PHS) such as the Indian Health Service.

   b. The Federal Bureau of Investigation (FBI) focuses on fraud on private health plans and on any health plan receiving federal funds such as Medicare, Medicaid, the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), and the Federal Employees Health Benefits Program (FEHBP).

   c. The Defense Criminal Investigative Service (DCIS), the investigative arm of the Office of the Inspector General), Department of Defense (DoD), is responsible for investigating alleged fraud and abuse in DoD programs. The programs include those which provide health care to active duty and retired military personnel, their dependents and survivors through: (1) direct care provided by a military medical treatment facility; and (2) civilian care provided through an indemnity type health insurance program known as the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS). The DCIS has primary investigative jurisdiction of all allegations of fraud committed by health care providers throughout the DoD Military Health Services System.

   d. The Office of Inspector General of the Department of Veterans Affairs (VA-IG) focuses on fraud on the VA which provides health benefits to our veterans.

   e. The Office of Inspector General of the Office of Personnel Management (OPM-IG) focuses on fraud on the FEHBP, which provides health benefits to federal civilian employees, retirees, and their dependents.

   f. The Office of Inspector General of the Department of Labor (DOL-OIG) focuses on health care fraud in three major Federal health benefit and disability program administered by DOL that compensate or provide benefits to Federal workers and certain coal miners and longshore/harbor workers, who sustain job-related injuries, illnesses or diseases. DOL-OIG also devotes significant attention to fraud within private sector health and welfare benefit plans regulated under the Employee Retirement Income Security Act.

   g. Other federal agencies investigate fraud by health care providers within their respective jurisdictions, *e.g.*, the Internal Revenue Service of the United States Department of the Treasury, Federal Trade Communication, and the United States Postal Inspectors.

2. *State and Local Investigative Agencies: Federal, State and local investigative agencies should work as partners with each other.*

a. Almost all of the states have Medicaid Fraud Control Units (MFCUs). The state Medicaid Fraud Control Units were established by federal law in 1977. The MFCUs are responsible for the investigation and prosecution (or referral for prosecution) of all criminal violations of state laws regarding fraud on the Medicaid program, as well as the investigation and prosecution of patient abuse and neglect in Medicaid-funded facilities. The MFCUs are certified by HHS-OIG and are required by federal law and regulation to meet certain minimal standards, including the employment of a multi-disciplinary team of attorneys, auditors, and investigators. In the Omnibus Budget Reconciliation Act of 1993, Congress required all states to maintain MFCUs as a condition of participation in the Medicaid program, unless granted a waiver by HHS.

b. State Attorneys General may have jurisdiction to investigate health care fraud offenses under state law.

c. Many district attorneys' offices also enforce state and local laws relating to health care fraud.

d. Several state oversight agencies whose focus is not health care fraud and abuse nevertheless may reveal problems which may constitute or be related to health care fraud and abuse. For example,

- State Surveillance and Utilization Review Subsystems (S/URS). The S/URS staff reviews systems output and conducts preliminary reviews of Medicaid providers to determine whether they can substantiate a pattern of fraud. If so, such allegations must be referred for fraud investigation.

- State Longterm Care Ombudsmen, funded through AOA, identify, investigate and resolve complaints involving the health and safety of residents of long-term care facilities.

- State survey and certification agencies monitor quality of care in longterm care facilities.

e. *Investigations by Private Health Plans:* Some private health plans investigate allegations of fraud. These efforts should be coordinated with the appropriate Federal, State and local investigative agencies.

## 3. Audits

1. *General:* Audit agencies contribute to the detection and elimination of fraud and abuse in a variety of ways, including: providing ongoing audit assistance in the investigation and prosecution of fraud cases, and conducting full-scale audits of the operations of health care providers, federal contractors, as well as the federal agencies themselves. Consistent with Federal auditing standards, audits may be traditional financial audits, or "performance audits," aimed at evaluating the performance of an entity or program in order to provide information to decisionmakers who have responsibility for overseeing the program or initiating corrective action.

2. *Federal:* While HHS-OIG Office of Audit Services (HHS-OIG-OAS) provides the majority of resources that are devoted to health care audits, audit work also is performed by a variety of other government agencies, by outside auditors hired by the government, and by private health plans.

   At the federal level, the audit agencies include those listed below. The description of the primary responsibilities of each agency for audit of particular health care programs shall not be interpreted to exclude any federal audit agency from auditing for fraud on other programs within its jurisdiction. The Program encourages greater coordination among audit agencies and between audit agencies and other law enforcement agencies.

   a. HHS-OIG-OAS focuses primarily on audits on the Medicare and Medicaid programs and on the health benefits programs funded or administered by the Department of Health and Human Services.

b. The Department of Justice has auditors who primarily work on civil fraud cases and who may work on audits related to investigations of health care fraud.

c. The Defense Contract Audit Agency (DCAA) of the Department of Defense performs audits of CHAMPUS contracts and, in accordance with auditing standards, reports observations of suspected fraud to appropriate authorities. Upon request, DCAA provides accounting/auditing assistance in fraud investigations of CHAMPUS contractors and providers.

d. The VA-IG will focus on audits for the VA.

e. The Corporate Audits Division of OPM-IG focuses on audits for the FEHBP. These audits concentrate primarily on health insurance carriers who contract with the federal government, but also may include health care providers and subscribers.

f. The DOL-OIG focuses primarily on audits targeting medical providers who defraud the three major health and benefits programs administered by DOL. Emphasis also is placed on individuals illegally receiving benefits, particularly those who are fraudulently receiving survivor's benefits.

3. *State and Local Audits*: As noted above, almost all states have Medicaid Fraud Control Units (MFCUs) which are responsible for the investigation and prosecution (or referral for prosecution) of all criminal violations of state laws regarding fraud on the Medicaid program. MFCUs employ a multi-disciplinary approach which includes audit work, along with investigative and prosecutive work. States also have other agencies with authority to conduct audits regarding health care fraud.

4. *Audits by Private Health Plans*: Some private health plans may conduct audits of claims submitted to them in order to verify the accuracy of the claims and detect fraud. These audit efforts should be coordinated with the appropriate federal, state and local investigative agencies.

## 4. Evaluations and Inspections

1. *General*: Evaluations and inspections to be undertaken under the Program include, but are not limited to, program evaluations or inspections, medical reviews, utilization reviews and fraud reviews. A program evaluation, sometimes called an "inspection," is a process, other than an audit or investigation, that evaluates, reviews, studies and analyzes government activities, for the purposes of recommending improvements to programs, policy, or procedures. Objectives of program evaluations include providing and presenting factual and analytical information, monitoring compliance, measuring performance, assessing program efficiency and effectiveness, and determining the extent and causes of fraud, waste, abuse and mismanagement. Program evaluation activities in the context of federally-funded health care programs include reviews, studies and analysis of program operations to identify program vulnerabilities and requirements for integrity safeguards. The techniques frequently employed in conducting evaluations of health care programs include:

a. Data analysis based upon claims for payment, program data related to beneficiaries and providers and other information collected or maintained by the government;

b. Medical review related to claims for reimbursement, for the purposes of establishing the medical necessity of the service, verifying the appropriateness of the program payment, and assessing the quality of care provided under the program;

c. Management and policy analysis to evaluate the efficiency and effectiveness of program policies and operations.

2. *Medicare and Medicaid*: Program evaluations related to the Medicare and Medicaid programs will be conducted by the HHS-OIG Office of Evaluation and Inspections (HHS-OIG-OEI). The results of

HHS-OIG-OEI evaluations will be used to make recommendations concerning policies and operations to program decision-makers, and to identify potential target areas for future action such as audit and investigation. For example, a study or series of studies conducted by HHS-OIG-OEI might identify and describe an area of significant vulnerability in a particular area of Medicare coverage and reimbursement. The results of this work would be used to shape appropriate policy changes, and the data and data analysis would be used further to support investigational activities that could eventually result in substantial fraud and abuse prosecutions and recoveries.

3. *DOD and CHAMPUS*: Program evaluations or inspections, medical reviews, utilization reviews and fraud reviews for CHAMPUS and other DOD health plan programs will be conducted by DOD personnel or by contractors.

4. *FEHBP*: Program evaluations related to the FEHBP will be conducted by the OPM-IG Office of Evaluation and Inspections. The evaluations gauge the efficiency and effectiveness of FEHBP policies and operations, as well as internal controls.

5. *VA*: Program evaluations or inspections, medical reviews, utilization reviews and fraud reviews for the VA will be conducted either by VA employees or by contractors.

6. *Federally-funded health plans in general*: Medical reviews, utilization reviews and fraud reviews for an investigation of health care fraud in any federally-funded health plan (including Medicaid and FEHBP) may, when necessary, be conducted by DOJ employees or contractors.

7. *Private health plans*: Program evaluations or inspections, medical reviews, utilization reviews and fraud reviews for private health plan(s) may be conducted by employees of the private health plan(s), or contractors. The results of these efforts should be shared with appropriate federal, state, and local investigative agencies.

5. **Relationship to Medicare Integrity Program**: The Health Care Financing Administration (HCFA) shares responsibility to detect fraud on the Medicare program. HCFA contracts for program integrity functions which include identification of Medicare fraud, referral to appropriate authorities, and prevention of Medicare fraud. Prior to the passage of the Health Insurance Portability and Accountability Act of 1996, HCFA contracted with the private insurance companies which process and pay claims for reimbursement made to the Medicare program to provide program integrity functions. The private insurance companies which process Medicare billings are called Medicare carriers and fiscal intermediaries.

Section 202 of the Health Insurance Portability and Accountability Act of 1996 provides for the establishment of the Medicare Integrity Program. The Medicare Integrity Program is not part of the Fraud and Abuse Control Program mandated by Section 201 of the Act. The Medicare Integrity Program authorizes the Secretary to enter into contracts with eligible entities, other than their carriers and fiscal intermediaries, to carry out five activities:

1. medical, utilization and fraud review;

2. cost report audits;

3. determinations of whether payments should be or should have been made under section 1862(b) of the Act, and recovery of payments that should not have been made;

4. education of providers, beneficiaries and other persons regarding payment integrity and benefit quality assurance issues; and

5. development and update of a list of items of durable medical equipment which are subject to prior authorization, pursuant to section 1834(a)(15).

The Secretary is required to use procedures in entering into the contracts which the Secretary establishes through regulation, although the Secretary may enter into contracts even though final regulations have not been promulgated.

Under the Fraud and Abuse Control Program, the HHS-OIG will coordinate referrals of matters for investigation and possible prosecution with the contractors engaged by HCFA to conduct program integrity functions under the Medicare Integrity Program.

6. **Conservation of Resources and Maximization of Results**: To minimize resources needed to investigate and prosecute any provider and to develop the most effective investigative strategy, the following procedures should be implemented.

   1. Each investigative agency will be responsible for ascertaining whether a subject of an investigation is already under investigation by any other agency and/or in multiple jurisdictions.

   2. When a federal or state investigative agency, a United States Attorney's Office or the Department of Justice ascertains that a subject is under investigation in multiple jurisdictions (whether by one or multiple agencies), they should convey that information to the relevant investigative agencies and the Department of Justice and the appropriate United States Attorneys' Offices so that together they can develop a nationwide strategy to most effectively coordinate the multiple efforts and efficiently use resources. Where the subject operates only in one state or in one metropolitan area, communication to the relevant United States Attorneys is sufficient.

   3. In the event that a federal multidistrict investigation is leading to a global settlement, all relevant parties, including appropriate state and local agencies should be informed of negotiations at the earliest possible date so that the appropriate entities, such as National Association of Medicaid Fraud Control Units, can designate a team of representatives to negotiate on their behalf. Similarly, in the event that a state-led multidistrict investigation results in a global settlement, similar early communication should occur.

# III. FACILITATE THE ENFORCEMENT OF THE CIVIL, CRIMINAL AND ADMINISTRATIVE STATUTES APPLICABLE TO HEALTH CARE

A. **Law Enforcement Cooperation**: In order to apply the full range of remedies, as appropriate, in a particular case, DOJ, HHS, and other enforcement and program agencies will work together and with the private sector to pursue a comprehensive enforcement approach to health care fraud. The foundation of this approach is coordinating and exchanging information in a regularized manner.

B. **Health Care Fraud Victims**: Department of Justice prosecutors and investigators shall ensure that victims' rights and services under federal statutes and administrative guidelines will be enforced for the benefit of victims of health care fraud, including provisions concerning notice to victims about case and offender status, appropriate consultation with victims, advocacy of restitution for victims, and enforcement of restitution awards for victims by the government.

C. **Coordination of Remedies**: Health care fraud matters frequently lend themselves to investigation and resolution through a combination of criminal, civil and administrative sanctions. Increasingly, government prosecutes responsible companies and persons, collects civil damages and penalties, and imposes administrative sanctions such as exclusion or compliance agreements. Under the Program, DOJ and HHS should make maximum use of all available remedies to fight health care fraud and abuse. This includes joint and parallel investigations and civil and criminal proceedings, where appropriate. To ensure maximum recovery for the United States while minimizing duplication of effort, early coordination of the criminal, civil and administrative remedies is critical.

   1. **Task Forces and Working Groups**: Federal, State, local, or regional health care fraud task forces/working groups can improve health care fraud enforcement by encouraging communication and coordination among law enforcement officials in the use of criminal, civil, and/or administrative remedies. Successful resolution of these cases and operation of the task forces depends on mutual cooperation.

   2. **Coordination of Administrative Remedies**: To ensure that administrative remedies are undertaken without adversely affecting other law enforcement activities, federal agencies will notify and coordinate with DOJ

before pursuing administrative remedies.

3. *Facilitating Access to Data*: Where appropriate, Memoranda of Understanding will be entered among participants in the Fraud and Abuse Control Program and others to ensure necessary and expedient access to data.

D. ***Joint and Parallel Proceedings***: Using all available remedies to fight health care fraud and abuse includes joint or parallel investigations and administrative, civil, and criminal proceedings. Although such proceedings are not unique to health care fraud cases, health care matters frequently lend themselves to investigation and resolution through a combination of criminal, civil, and administrative sanctions. Parallel or joint proceedings help maximize the government's recovery while minimizing duplication of effort. It is the goal of the Department of Justice and HHS that civil, criminal, and administrative remedies should be sought jointly and not to the exclusion or detriment of each other in seeking to redress health care fraud.

1. United States Attorneys should consider the establishment of a separate unit to handle health care fraud cases criminally and civilly; when feasible, this approach will help insure that the Department of Justice's interest in effecting a complete civil and criminal recovery will be achieved.

2. Consistent with the Department's regulations, the United States Attorney's offices remain the focal point for the coordination of criminal and civil remedies within a district. Every United States Attorney should institute a system of coordination of the criminal, civil and administrative aspects of all appropriate matters that ensures that all criminal referrals, indictments, declinations, pleas and convictions are assessed for their impact on potential and appropriate civil fraud remedies. Criminal and civil attorneys should inform each other and affected agencies of the progress of their respective cases, especially at critical junctions to ensure that the criminal, civil and administrative aspects of these matters are appropriately addressed. This coordination system also should insure that an agency will not impose a civil monetary penalty without prior coordination with and authorization from DOJ.

3. If possible, joint investigations are encouraged, utilizing the guidance of the criminal and civil prosecutors and investigative agencies. While each casemust be considered on its own merits, investigators and attorneys should consider obtaining documents by non-grand jury means such as authorized investigative demands and/or Inspector General subpoenas and search warrants, and where appropriate sharing them with the criminal, civil and agency personnel responsible for the matter.

4. Where necessary, criminal proceedings may be pursued separately and prior to or subsequent to civil proceedings to avoid discovery problems. Consideration, however, should be given to statutes of limitations, dissipation of assets and the potential continuing harm to patients and payers in deciding the timing of civil and administrative actions. Filing and staying civil actions may be appropriate. In other cases, it may be appropriate for the civil action to proceed first.

5. Criminal and civil investigations may reveal indications of quality of care issues, and patient harm or abuse. Information concerning these matters should expeditiously be disseminated to the appropriate authority so that no further harm can occur. If a court order would be required in order to disclose to appropriate authorities information which is protected by grand jury secrecy rules or other laws, such an order should be sought.

6. The focus of civil and criminal prosecutions is not always identical. Civil prosecutions may have different targets, apply a different analysis to damages, have a focus that is broader as to time periods or transactions, or require immediate attention to prevent dissipation of assets. Therefore, as soon as a prosecutor ascertains that the matter may have a financial impact on the treasury or otherwise may give rise to civil liability, the attorney responsible for the civil action should be notified in order to provide input into the investigation and advise the criminal prosecution team regarding the avoidance of problems arising from grand jury secrecy. Additionally, referrals prior to grand jury proceedings permit meaningful input regarding civil liability if there should be global plea agreements and requests for restitution orders under the Mandatory Victim Restitution Act.

E. **Settlements and Compliance Agreements**

1. ***Coordination***: Any settlement should be coordinated with the appropriate encies within the federal government representing the federal programs affected. To the extent that Medicaid is involved, coordination with the States, generally through the National Association of Attorneys General and/or the National Association of Medicaid Fraud Control Units, is appropriate.

2. ***Compliance Provisions:*** Generally, settlement of health care fraud issues should have an accompanying compliance agreement or compliance provisions aimed at preventing future wrongdoing by putting safeguards in place to correct past misconduct, and identify and correct any future misconduct. It is the responsibility of HHS to negotiate such an agreement where the Medicare or Medicaid program is implicated. Appropriate provisions should be included in agreements to ensure remedies for noncompliance with the agreement.

3. ***Criminal Liability of Individuals***: Settlement or plea agreements with corporations or other entities which serve to resolve the entity's criminal liability by guilty plea, pre-trial diversion, or other disposition should not release individuals from criminal liability. The criminal liability of individuals through whom the entity committed its acts should be investigated and should be resolved separately from the entity's liability.

4. ***Monetary Recoveries and Fines***: In civil settlements, it is the policy of the Department of Justice to seek full recovery of losses to the affected government health care programs. In all appropriate cases, it is the policy of the Department of Justice to seek recovery in excess of the government's losses where such sums could be recovered as multiple damages and/or civil penalties under the False Claims Act, 31 U.S.C. §§ 3729 - 3733, the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812, or otherwise under other authorities. The DOJ will consider a settling party's inability to pay on a case-by-case basis. Proposed criminal fines should fall within the ranges proscribed by the United States Sentencing Guidelines. In plea agreements in criminal cases, it is the position of DOJ that consideration be given to requesting that the defendant provide full restitution to all victims of all charges in the indictment or information.

5. ***Global Settlements***: A global settlement agreement between a United States Attorney and a provider or supplier entered into for the purpose of resolving civil and/or criminal responsibility for past conduct, should not include within it any sections designed to regulate future billing procedures and policies, unless those provisions have been reviewed by the HHS Office of Counsel to the Inspector General, Civil Recoveries Branch or any other relevant program agency. Where a global settlement agreement involves several United States Attorneys' Offices, resolution may be facilitated by the Criminal and Civil Divisions of the Department of Justice.

F. Each Federal, state, and local law enforcement agency responsible for the enforcement of laws relating to fraud and abuse with respect to health plans should establish policies which, where otherwise authorized by law, provide for the restoration of the proceeds of lawfully forfeited assets to health plans or other victims of health care fraud up to the value of the property forfeited in connection with theoffense that caused the loss suffered by the victim.

G. *Voluntary Disclosure Program*. The Attorney General and the Secretary will continue to explore the utility of a disclosure program to enable health providers to voluntarily disclose to the government evidence of fraud against Medicare which they have discovered within their organizations.

# IV. PROVIDE INDUSTRY GUIDANCE, INCLUDING ADVISORY OPINIONS, SAFE HARBORS, AND SPECIAL FRAUD ALERTS RELATING TO FRAUDULENT HEALTH CARE PRACTICES

A. **General**

The HHS "safe harbor" regulations are designed specifically to identify protected behavior and business

21 USC Ch. 9: FEDERAL FOOD, DRUG, AND COSMETIC ACT

From Title 21—FOOD AND DRUGS

CHAPTER 9—FEDERAL FOOD, DRUG, AND COSMETIC ACT

SUBCHAPTER I—SHORT TITLE

Sec.
301.         Short title.

SUBCHAPTER II—DEFINITIONS

321.         Definitions; generally.
321a.        "Butter" defined.
321b.        "Package" defined.
321c.        Nonfat dry milk; "milk" defined.
321d.        Market names for catfish and ginseng.

SUBCHAPTER III—PROHIBITED ACTS AND PENALTIES

331.         Prohibited acts.
332.         Injunction proceedings.
333.         Penalties.
333a.        Repealed.
334.         Seizure.
335.         Hearing before report of criminal violation.
335a.        Debarment, temporary denial of approval, and suspension.
335b.        Civil penalties.
335c.        Authority to withdraw approval of abbreviated drug applications.
336.         Report of minor violations.
337.         Proceedings in name of United States; provision as to subpoenas.
337a.        Extraterritorial jurisdiction.

SUBCHAPTER IV—FOOD

341.         Definitions and standards for food.
342.         Adulterated food.
343.         Misbranded food.
343–1.       National uniform nutrition labeling.
343–2.       Dietary supplement labeling exemptions.
343–3.       Disclosure.
343a.        Repealed.
344.         Emergency permit control.
345.         Regulations making exemptions.
346.         Tolerances for poisonous or deleterious substances in food; regulations.
346a.        Tolerances and exemptions for pesticide chemical residues.
346b.        Authorization of appropriations.
347.         Intrastate sales of colored oleomargarine.
347a.        Congressional declaration of policy regarding oleomargarine sales.
347b.        Contravention of State laws.
348.         Food additives.
349.         Bottled drinking water standards; publication in Federal Register.
350.         Vitamins and minerals.
350a.        Infant formulas.
350b.        New dietary ingredients.
350c.        Maintenance and inspection of records.
350d.        Registration of food facilities.
350e.        Sanitary transportation practices.
350f.        Reportable food registry.
350g.        Hazard analysis and risk-based preventive controls.
350h.        Standards for produce safety.

| | |
|---|---|
| 350i. | Protection against intentional adulteration. |
| 350j. | Targeting of inspection resources for domestic facilities, foreign facilities, and ports of entry; annual report. |
| 350k. | Laboratory accreditation for analyses of foods. |
| 350l. | Mandatory recall authority. |
| 350l–1. | Annual report to Congress. |

## SUBCHAPTER V—DRUGS AND DEVICES

## PART A—DRUGS AND DEVICES

| | |
|---|---|
| 351. | Adulterated drugs and devices. |
| 352. | Misbranded drugs and devices. |
| 353. | Exemptions and consideration for certain drugs, devices, and biological products. |
| 353a. | Pharmacy compounding. |
| 353a–1. | Enhanced communication. |
| 353b. | Outsourcing facilities. |
| 353c. | Prereview of television advertisements. |
| 354. | Veterinary feed directive drugs. |
| 355. | New drugs. |
| 355–1. | Risk evaluation and mitigation strategies. |
| §355–2. | Actions for delays of generic drugs and biosimilar biological products. |
| 355a. | Pediatric studies of drugs. |
| 355b. | Adverse-event reporting. |
| 355c. | Research into pediatric uses for drugs and biological products. |
| 355c–1. | Report. |
| 355d. | Internal committee for review of pediatric plans, assessments, deferrals, deferral extensions, and waivers. |
| 355e. | Pharmaceutical security. |
| 355f. | Extension of exclusivity period for new qualified infectious disease products. |
| 355g. | Utilizing real world evidence. |
| 356. | Expedited approval of drugs for serious or life-threatening diseases or conditions. |
| 356–1. | Accelerated approval of priority countermeasures. |
| 356a. | Manufacturing changes. |
| 356b. | Reports of postmarketing studies. |
| 356c. | Discontinuance or interruption in the production of life-saving drugs. |
| 356c–1. | Annual reporting on drug shortages. |
| 356d. | Coordination; task force and strategic plan. |
| 356e. | Drug shortage list. |
| 356f. | Hospital repackaging of drugs in shortage. |
| 356g. | Standards for regenerative medicine and regenerative advanced therapies. |
| 356h. | Competitive generic therapies. |
| 356i. | Prompt reports of marketing status. |
| 357. | Qualification of drug development tools. |
| 358. | Authority to designate official names. |
| 359. | Nonapplicability of subchapter to cosmetics. |
| 360. | Registration of producers of drugs or devices. |
| 360a. | Clinical trial guidance for antibiotic drugs. |
| 360a–1. | Clinical trials. |
| 360a–2. | Susceptibility test interpretive criteria for microorganisms. |
| 360b. | New animal drugs. |
| 360c. | Classification of devices intended for human use. |
| 360c–1. | Reporting. |
| 360d. | Performance standards. |
| 360e. | Premarket approval. |
| 360e–1. | Pediatric uses of devices. |
| 360e–3. | Breakthrough devices. |
| 360f. | Banned devices. |
| 360g. | Judicial review. |
| 360g–1. | Agency documentation and review of significant decisions regarding devices. |
| 360h. | Notification and other remedies. |
| 360h–1. | Program to improve the device recall system. |
| 360i. | Records and reports on devices. |
| 360j. | General provisions respecting control of devices intended for human use. |
| 360k. | State and local requirements respecting devices. |

Go♥gle    foodfraudparasiticinfection/usc                    ✕    🔍          ⠿    🔵

🔍 All    📰 News    🖼 Images    🛒 Shopping    ▶ Videos    ⋮ More        Settings    Tools            SafeSear

About 244,000 results (0.64 seconds)

Showing results for **food fraud parasitic infection**/usc
No results found for foodfraudparasiticinfection/usc

www.ncbi.nlm.nih.gov › pubmed
ᵃ Influence of parasitic infection on food intake. - NCBI
Fed Proc. 1984 Feb;43(2):239-45. Influence of parasitic infection on food intake. Crompton DW.
The results of controlled experiments have demonstrated ...
by DW Crompton - 1984 - Cited by 86 - Related articles
Missing: fraud use

People also ask

What foods should you avoid if you have parasites?                          ⌄

What food has the most parasites?                                           ⌄

What is the most common parasitic infection?                                ⌄

How do you know if you have parasites?                                      ⌄

                                                                      Feedback

www.ncbi.nlm.nih.gov › pubmed ▾
Parasitic contaminants in food. - NCBI
One of the major factors influencing the prevalence of parasitic infections in the population is
the habit, and traditional popularity of eating raw or inadequately ...
by MT Anantaphruti - 2001 - Cited by 29 - Related articles
Missing: fraud use

www.cdc.gov › parasites › travelers ▾
CDC - Parasites - Travelers - Centers for Disease Control
Many infectious diseases transmitted in food and water can also be acquired directly through
the fecal-oral route. Parasitic Illnesses That Can Be Acquired During ...
Missing: fraud use

www.cdc.gov › parasites › food ▾
CDC - Parasites - Food - Centers for Disease Control
Oct 6, 2015 - Numerous parasites can be transmitted by food including many protozoa and
helminths. In the United States, the most common foodborne ...
Missing: fraud use

uscode.house.gov › view › chapter9
[USC02] 21 USC Ch. 9: FEDERAL FOOD, DRUG, AND ...
Expedited approval of drugs for serious or life-threatening diseases or conditions. ... The Federal
Food and Drugs Act of June 30, 1906, as amended (U.S.C., 1934 ed. ... or that the labeling of the
misbranded article is fraudulent, or would be in a ... drug residues, decomposition, parasites,
allergens, and unapproved food and ...

www.usda.gov › oig › webdocs  PDF
ARS' Animal Welfare Act Controls to Prevent ... - USDA
Sep 24, 2019 - We identified the animals ARS used for parasitic disease research and
determined ... farm animals such as, but not limited to, livestock or poultry used or intended for
use as food or ... The Animal Welfare Act, as codified in 7 U.S.C. Chapter 54, defines "animals" as
any live or ... Fraud, Waste, and Abuse.

Go♥gle

foodfraudparasiticinfection/usc                                    ✕    🔍                    ⠿  ⠿⠿

Sep 1, 2017 - This parasite can be found in soil, food, water or surfaces that have been
contaminated with feces from infected humans or animals. People get ...
Missing: fraud use

www.fda.gov › media › download  ▾  PDF

## Hazard Analysis and Risk-Based Preventive Controls ... - FDA

Applied Nutrition at the U.S. Food and Drug Administration. ... biological hazards, including
microbiological hazards such as parasites, environmental ... processing operations and can
cause consumer illness or disease. ... resources include a free on-line food fraud database made
available by the U.S. Pharmacopeial.

## Images for food fraud parasitic infection/usc



→ More images for food fraud parasitic infection/usc

Report images

www.fda.gov › news-events › press-announcements › coronavirus-co... ▾

## Coronavirus (COVID-19) Update: Daily Roundup, March 24 ...

Mar 24, 2020 - The U.S. Food and Drug Administration today announced the following ... serious
or immediately life-threatening COVID-19 infections through the process of ... of the Federal
Food, Drug, and Cosmetic Act (Act) (21 U.S.C. § 360bbb-3). ... to be beware of fraudulent
coronavirus tests, vaccines and treatments.

## Searches related to food fraud parasitic infection/usc

common parasitic infections in india          travel parasite symptoms
mexican parasite treatment                    parasites in africa
how to get rid of a parasite from mexico      parasite cleanse india
mexican parasite symptoms                      peruvian parasite symptoms

Dixon, New Mexico - From your Internet address - Use precise location - Learn more

Help    Send feedback    Privacy    Terms

Google    fraud/food poisoning usc    ✕    🔍    ⠿    Sign i

🔍 All    📰 News    🖾 Images    🛍 Shopping    ▷ Videos    ⋮ More    Settings    Tools    SafeSea

About 1,950,000 results (0.38 seconds)

www.foxnews.com › travel › travel-industry-fights-back-following-expl...
**in fraudulent food poisoning insurance claims - Fox News**
Jun 17, 2018 - The number of bogus **food-poisoning** and gastric illness claims filed by Britons
traveling abroad is reported to have reached epidemic ...
Missing: use | Must include: usc

fas.org › sgp › crs › misc ▾    PDF
**Food Fraud and "Economically Motivated ... - FAS.org**
Jan 10, 2014 - **Food fraud**, or the act of defrauding buyers of **food** or ingredients for economic
gain—whether ... some types of **food poisoning** or exposure to certain allergens.6 ... **U.S.C.**
§342[b]), are **foods** deemed to be adulterated given the ...
by R Johnson - 2014 - Cited by 170 - Related articles

www.keckmedicine.org › is-it-the-stomach-flu-or-food-poisoning ▾
**Is It the Stomach Flu or Food Poisoning? | Keck Medicine of USC**
Sep 25, 2019 - The stomach flu and **food poisoning** can both bring stomach pain, nausea,
vomiting and diarrhea, but knowing the cause can help you figure ...
Missing: fraud/ | Must include: fraud/

www.govinfo.gov › USCODE-2010-title18-partI-chap47-sec1040 ▾
**18 U.S.C. 1040 - Fraud in connection with major disaster or ...**
Title 18 - CRIMES AND CRIMINAL PROCEDURE PART I - CRIMES CHAPTER 47 - **FRAUD** AND
FALSE STATEMENTS Sec. 1040 - **Fraud** in connection with ...

www.govinfo.gov › details › USCODE-2009-title41-chap9-sec604 ▾
**41 U.S.C. 604 - Fraudulent claims - Content Details ... - GovInfo**
Title 41 - PUBLIC CONTRACTS CHAPTER 9 - CONTRACT DISPUTES Sec. 604 - **Fraudulent** claims.
Contains. section 604. Date. 2009. Laws In Effect As Of ...

Images for fraud/food poisoning usc

   

→ More images for fraud/food poisoning usc    Report images

www.cbs46.com › news › one-arrested-suspects-wanted-for-food-poison...
**One arrested, 9 suspects wanted for food poisoning insurance ...**
Mar 26, 2020 - ... is behind bars, as police continue searching for nine more suspects who they
believe played a role in a **food poisoning** insurance **fraud** ring.
Missing: use | Must include: usc

www.nchs-health.org › Uncategorized ▾
**Is It Food Poisoning or the Stomach Flu? - North County ...**
**Food poisoning** symptoms include the following: Abdominal pain or cramping; Nausea &
vomiting; Diarrhea; Dehydration; High fever; Blood in vomit or stools ...
Missing: fraud/ | Must include: fraud/

books.google.com › books

Patient Care Case Law: Ethics, Regulation, and Compliance

**food poisoning**, 345–347 **food** service industry inspection, hospital ... IV § 482.55 (3) (emergency services), 117 42 **U.S.C.** § 1295dd(a) (appropriate screening), 154 42 **U.S.C.** ... See insurance **fraud** functional assessment, reason for, 116 ...

George D. Pozgar - 2012 - Law

books.google.com › books

FDA Consumer - Volume 11 - Page 34 - Google Books Result

**Fraud.** Statute. (18. **U.S.C.**. 1341). and/or. the. False. Representation Statute (39 ... **Food** Cheks packets of red liquid for detecting **food poisoning** organisms/ ...

1977 - Consumer protection

## Searches related to fraud/food poisoning usc

**food fraud** and economically motivated adulteration of food and food **ingredients**

food poisoning **symptoms**

**yeast** food fraud

**economically motivated adulteration (ema) risk assessment**

**free** food **adulteration database**

**usp** food fraud **database free**

**stomach flu vs** food poisoning

**stomach flu or** food poisoning **quiz**

1  2  3  4  5  6  7  8  9 10        Next

**Dixon, New Mexico** - From your Internet address - Use precise location - Learn more



# Walmart ✳ Claims Services

February 11, 2020

|Anthony Hicks
PO Box #53
Embudo, NM  null|

RE:            Anthony Hicks
File Number:   9088620
Date of Loss:  01/01/2020
Facility #:    9109
Entity Name:   Walmart Inc.

Dear Anthony Hicks:

Thank you for shopping at one of the Walmart family of brands.  Walmart Claims Services (WCS) has administered retail customer injury and property damage claims for Walmart and its related companies and their insurance companies since 1993. Our company believes in treating customers fairly and in providing excellent customer service.

I am sorry to hear of your incident with a product purchased from one of the Walmart family of brands retailers.  I hope we have talked on the telephone before you receive this letter. If we have not talked, please call me at your earliest opportunity to let me know how you are doing. If you have a "call blocking" or similar feature on your telephone, please allow it to accept calls from my telephone number.

You are a valued customer and I hope you will continue to shop at the Walmart family of brands, including online.

Sincerely,

**Agathia Asril** - *Case Manager I, Gene*
Phone: 800-527-0566+58247
Fax: 877-219-0742
Email: Agathia.Asril@walmart.com

Walmart Claims Services, Inc.
PO BOX 14731
Lexington, KY 40512-4731

 Anthony Hicks
PO Box #53
Embudo, NM  null

2





# Walmart :: Claims Services

February 18, 2020

|Anthony Hicks
PO Box #53
Embudo, NM  87531|

RE:            Anthony Hicks
File Number:   9088620
Date of Loss:  01/01/2020
Facility #:    9109
Entity Name:   Walmart Inc.

Dear Anthony Hicks:

Thank you for shopping at one of the Walmart family of brands. I am sorry to hear about your incident on 01/01/2020 which involved GREAT VALUE TURKEY. WCS is committed to the fair, reasonable and efficient administration of claims, and to providing superior customer service.

Upon reviewing your claim, Walmart Claims Services sent the claim to the product supplier; Carl Buddig Company*..., to handle with you. Pursuant to the agreement between the supplier and Walmart, the supplier or its insurance company will be responsible for the investigation and resolution of this claim with you.

We have asked that a Carl Buddig Company*... representative contact you in the near future. The supplier may send you a written request for more information about your claim. When asked to do so, please respond to the supplier's request as soon as possible to ensure the prompt investigation and resolution of your claim. If you do not hear from the supplier, please feel free to contact them directly at the phone number or address listed here:

**Carl Buddig Company*...**
**Attn: Claims Dept**
**950 W 175th Street**
**Homewood, IL  60430**
**Phone:** 708-798-0900 / **Email:** CATHY_COLWILL@AJG.COM

You are a valued customer and I hope you will continue to shop at the Walmart family of brands, including online.

Sincerely,

**Agathia Asril** - *Case Manager I, Gene*
Phone: 800-527-0566+58247
Fax: 877-219-0742
Email: Agathia.Asril@walmart.com

Walmart Claims Services, Inc.
PO BOX 14731
Lexington, KY 40512-4731

   Anthony Hicks
PO Box #53
Embudo, NM  87531

2



0001000111000208000000000208

APRIL 21, 2020

U.S. COURTHOUSE,

SANTA FE COUNTY.

DEAR MADAME, OR SIRS,

I ACCEPTED THIS INVITATION BY WALMART WITH PLEASURE, & AS A RESULT A  EXTREMELY STRESS-FUL SITUATION @ HOME; WHICH RENDERED MY PET COYOTTI, & MYSELF, LEAVING HOME IN THE WEE HOURS OF THE NIGHT.  COYOTTI MY PUPPY SO CRITICAL HE RAN OFF LIKE  NEVER BEFORE, SHARPLY/INTO THE NIGHT, IN HARMS WAY.  MY PET SNAUZIER TERRIER,  ATTACKED BY 2 DOBBERMAN PITCHERS WHO CUT HIM OFF ON THE WAY BACK HOME LATER THAT NIGHT.  DIED FROM HIS INJURIES THE NEXT DAY:  3/25/2020.

SINCERELY & TRULY YOURS,

Go♥gle    wrongfuldeathofapet/usc                               ✕    🔍

🔍 All    📰 News    🛍 Shopping    🖼 Images    ▶ Videos    ⋮ More        Settings    Tools                    SafeSear

About 193,000 results (0.65 seconds)

Showing results for *wrongful death of pet*/usc
No results found for wrongfuldeathofapet/usc

scholarship.law.upenn.edu › cgi › viewcontent   PDF
Recovering for the Loss of a Beloved Pet - Penn Law: Legal ...
the **Wrongful Death** of a Companion Animal, 4 **ANIMAL** L. 33, 60 (1998) ("Since ... 41 **Animal**
Welfare Act of 1966, 7 **U.S.C.** §§ 2131–2159 (2012) (describing the ...
by LM Sirois - 2015 · Cited by 13 · Related articles

### People also ask

Can I sue my vet for killing my cat?                                      ⌄

Can you sue someone for losing your pet?                                  ⌄

Can I sue someone if their dog killed my dog?                             ⌄

                                                                  Feedback

www.animallaw.info › cases › topic › pet-damages  ▾
Pet Damages: Related Cases | Animal Legal & Historical Center
The trial court awarded damages to Liddle for the **loss** of her **dog** ... on his own private property
or on public property, the destruction of an **animal** is **wrongful** ... Plaintiffs, the owners of the
animals, brought suit under 42 **U.S.C.** § 1983, alleging ...

www.animallaw.info › article › animal-consortium  ▾
ANIMAL CONSORTIUM | Animal Legal & Historical Center
C. Limiting the Scope of Animal Consortium Claims 908. D. Who is ... of this sort. Dogs and cats
will not have a **wrongful death** action, but the human will have the derivative claim for loss of
consortium. ... 39 42 **U.S.C.** § 1983 (2012). 40 Smith v ...

www.justice.gov › ... › Supreme Court Briefs  ▾
Chomic v. United States - Opposition | OSG | Department of ...
Oct 21, 2014 - The jurisdiction of this Court is invoked under 28 **U.S.C.** 1254(1). ... **Pet.** App. 23a-
25a. The Michigan **Wrongful Death** Act, the court stated, ...

www.justice.gov › sites › default › files › osg › briefs › 1990/01/01  ▾
SHIRLEY M. MOLZOF, PERSONAL REPRESENTATIVE OF ...
Jan 1, 1990 - The jurisdiction of this Court rests upon 28 **U.S.C.** 1254(1). ... **Pet.** App. 8-9.
Concluding that "an award of damages for loss of enjoyment of ... which set a monetary ceiling
on punitive damages in **wrongful death** cases applied ...

aldf.org › article › damages-for-death-or-injury-of-an-animal  ▾
Damages for Death or Injury of an Animal
This is a broad overview intended to be useful to caregivers of animals who have been injured or
**killed.**
Missing: ~~uee~~ | Must include: usc

cqrcengage.com › akc › file › J. Jacobs AKC Companion Animal Law...  ▾   PDF
Curtailing Companion Compensation: Why ... - CQ Engage
Mar 1, 2018 - structure of liability and compensation for **pet** injury and death is the ... claims
under 42 **U.S.C.** § 1983, as well as for IIED, malicious injury to a **pet**, ... plaintiff's **pet**.33 Courts
have relied on **medical malpractice** law when ...

Go♥gle

wrongfuldeathofapet/usc                                        ✕    🔍                            ⋮⋮⋮

Apr 4, 2018 - The article discusses how juries are awarding substantial damages when **pets** are
**killed** due to police misconduct. According to U.S. ...

www.law.cornell.edu › uscode › text  ▾

## 11 U.S. Code § 522 - Exemptions | U.S. Code | US Law | LII ...

a payment on account of the **wrongful death** of an individual of whom the debtor was a
dependent, to the extent reasonably necessary for the support of the ...

## Images for wrongful death of pet/usc



→  More images for wrongful death of pet/usc                          Report images

## Searches related to wrongful death of pet/usc

damages for loss of pet

wrongful pet death lawsuit

emotional distress damages for loss of a pet

damages for injury to a pet

damages for death or injury of an animal california

animal tort cases

pet legal advice

dog property damage

**Dixon, New Mexico** - From your Internet address - Use precise location - Learn more

Help      Send feedback      Privacy      Terms

# COMMENT

---

## RECOVERING FOR THE LOSS OF A BELOVED PET: RETHINKING THE LEGAL CLASSIFICATION OF COMPANION ANIMALS AND THE REQUIREMENTS FOR LOSS OF COMPANIONSHIP TORT DAMAGES

LAUREN M. SIROIS[†]

*Under U.S. law, animals are considered the property of their human companions. With this classification, individuals are granted the right to own, use, and control their animal property as they see fit. To many, though, the relationship between man and his companion animal fits uncomfortably within the idea of property ownership. To these individuals, companion animals, such as dogs and cats, are more than property: they are best friends, confidants, and integral parts of the family. However, unlike certain familial relationships—such as that of a husband and wife or a parent and child—the bond between a human companion and his or her companion animal is devalued under tort law. When a companion animal is negligently or intentionally injured or killed, no matter how beloved the animal is to his or her human companion, the animal is still only viewed as property under the law. Because of the companion animal's classification as property, emotional damages related to the bond between the animal and the plaintiff are unavailable, preventing those who have been harmed from fully recovering for their loss.*

INTRODUCTION ........................................................................1201
I.    COMPANION ANIMALS AS PROPERTY UNDER U.S. LAW .......... 1205

---

† Senior Editor, Vol. 163, *University of Pennsylvania Law Review*. J.D. Candidate, 2015, University of Pennsylvania Law School; B.S., 2011, Tufts University.

A.  *The History of Property and the Classification of Animals* .............. 1205
B.  *How the Property Classification Impacts Human Companions* ......... 1207
II.  THE RECOVERY OF LOSS OF COMPANIONSHIP DAMAGES
    UNDER U.S. TORT LAW ....................................................... 1209
III. THE EVOLUTION OF LOSS OF COMPANIONSHIP DAMAGES FOR
    COMPANION ANIMALS ........................................................... 1211
    A.  *Legislative Developments* .................................................. 1212
        1.  Tennessee ............................................................. 1212
        2.  Illinois ................................................................. 1213
        3.  Connecticut .......................................................... 1214
    B.  *Common Law Developments* ............................................. 1215
        1.  The Acceptance of Loss of Companionship Damages as
            Part of the "Actual Value" of a Companion Animal ............. 1215
        2.  The Rejection of Loss of Companionship Damages
            Under the Actual Value Test and Due to the
            Property Classification of Animals ................................. 1218
        3.  The Acceptance of Other Emotional Damages ................... 1220
IV. THE MINORITY TREND: ARGUMENTS FOR EXPANDING
    LOSS OF COMPANIONSHIP DAMAGES TO
    COVER COMPANION ANIMALS ................................................ 1221
    A.  *Expansion Promotes the Goals of Tort Law* ..................................... 1221
    B.  *Expansion Is a Natural Next Step* .............................................. 1224
    C.  *Expansion Is Rational Because Companion Animals Already Receive
        Protection Unique to "Property" Under the Law* ............................. 1224
V.  PROMOTING THE MINORITY VIEW: APPROACHES TO EXPANDING
    TORT RECOVERY TO INCLUDE LOSS OF COMPANIONSHIP
    DAMAGES TO HUMAN COMPANIONS ...................................... 1225
    A.  *Where Should Change Occur? Advocating for the Legislature* ........... 1226
    B.  *A Special Status of Companion Animals: Creating a Unique
        Semi-Property Classification* ...................................... 1227
        1.  A New Semi-Property Classification ................................ 1227
        2.  Oppositional Arguments and Responses in Rebuttal ......... 1228
    C.  *A New Subset of Loss of Companionship Damages Claims* .............. 1230
        1.  Description of a New Recovery Statute ............................ 1230
        2.  Oppositional Arguments and Responses in Rebuttal ......... 1234
CONCLUSION .............................................................................. 1239

## INTRODUCTION

The bond between a human and a dog or a cat, the two most accepted species of "companion animal,"[1] is anything but novel. The domestication of animals is estimated to have occurred 12,000 to 14,000 years ago.[2] Specifically, the domestication of dogs is thought to have occurred during this time period,[3] while it is estimated that cats became household animals roughly 4500 years ago.[4] Today, over 68 million domesticated dogs are living in U.S. homes,[5] with 39% of the U.S. population owning at least one dog.[6] Many companion animals are "named, nurtured, and treated like

---

[1] For the purpose of this Comment, unless otherwise noted, "companion animal" refers to a domesticated dog or cat that was bred for human companionship. Companion animals are commonly considered a subcategory of domesticated animals. *See* Rebecca J. Huss, *Valuing Man's and Woman's Best Friend: The Moral and Legal Status of Companion Animals*, 86 MARQ. L. REV. 47, 69 (2002) [hereinafter Huss, *Valuing Man's and Woman's Best Friend*]. In *Valuing a Man's and Woman's Best Friend*, Rebecca J. Huss writes that whether an animal is considered a companion animal is determined by evaluating evidence of the relationship between the animal and the human companion. *Id.* The word "pet," defined as an animal that is "tamed or domesticated and kept as a companion or treated with fondness," encompasses other common household animals, including rabbits, hamsters, mice and other rodents, fish, birds, lizards, and snakes. Janice M. Pintar, Comment, *Negligent Infliction of Emotional Distress and the Fair Market Value Approach in Wisconsin: The Case for Extending Tort Protection to Companion Animals and Their Owners*, 2002 WIS. L. REV. 735, 738 (citing WEBSTER'S NEW WORLD DICTIONARY 2009 (3d ed. 1991)). This Comment avoids the term "pet." While the abovementioned animals are arguably no different from a dog or a cat in the sense that they can fit the requirements of a "companion animal," the arguments for altering the property classification of animals or expanding loss of companionship recovery are stronger when focused solely on dogs and cats.

[2] *See* Margit Livingston, *The Calculus of Animal Valuation: Crafting a Viable Remedy*, 82 NEB. L. REV. 783, 805 (2004) ("Domestication of non-human animals . . . began 12,000 years ago . . . ."); Marcella S. Roukas, *Determining the Value of Companion Animals in Wrongful Harm or Death Claims: A Survey of U.S. Decisions and Legislative Proposal in Florida to Authorize Recovery for Loss of Companionship*, 3 J. ANIMAL L. 45, 51 (2007) ("The domestication of animals began almost 14,000 years ago.").

[3] Schyler P. Simmons, Comment, *What is the Next Step for Companion Pets in the Legal System? The Answer May Lie with the Historical Development of the Legal Rights for Minors*, 1 TEX. A&M L. REV. 253, 254 (2013); *see also* Phil Goldberg, *Courts and Legislatures Have Kept the Proper Leash on Pet Injury Lawsuits: Why Rejecting Emotion-Based Damages Promotes the Rule of Law, Modern Values, and Animal Welfare*, 6 STAN. J. ANIMAL L. & POL'Y 30, 65 (2013) ("The domestication of dogs occurred more than 14,000 years ago.").

[4] Simmons, *supra* note 3, at 254.

[5] Cynthia A. McNeely & Sarah A. Lindquist, *Dangerous Dog Laws: Failing to Give Man's Best Friend a Fair Shake at Justice*, 3 J. ANIMAL L. 99, 103 (2007).

[6] Simmons, *supra* note 3, at 254; *see also id.* ("[M]ore than 33% of the [U.S.] population own cats.").

children, siblings, or best friends"[7] and provide their human companions with "faithful, intimate companionship that is unconditional and nonjudgmental."[8] Companion animals are more than just pets; to many, they are part of the family.[9] Margit Livingston, Professor of Law at DePaul University College of Law, argues that human companions build "sentimental attachment" to their companion animals, an emotional connection based upon the appreciation of their companionship—"their loyalty, their physical proximity, [and] their dependence upon us"—which is similar to the attachment one would have toward another human being.[10]

The death of a companion animal can be emotionally and psychologically devastating for a human companion.[11] In fact, human companions can experience a sense of loss similar to the loss felt when a human family member passes away.[12] Even so, when a companion animal dies due to the negligent or intentional acts of another, the U.S. tort system inadequately compensates the human companion. U.S. law almost universally denies recovery for loss of companionship damages in tort actions when the injured or deceased victim is a companion animal.[13] Why? First, companion animals are classified as the property of their human companions, even though

---

[7] Debra Squires-Lee, Note, *In Defense of Floyd: Appropriately Valuing Companion Animals in Tort*, 70 N.Y.U. L. REV. 1059, 1059 (1995).

[8] *Id.* at 1065.

[9] *See* Christopher D. Seps, Note, *Animal Law Evolution: Treating Pets as Persons in Tort and Custody Disputes*, 2010 U. ILL. L. REV. 1339, 1359 (referencing studies finding that 88% of Australian pet owners and 49% of American pet owners described their dog as a "family member") (citing Emma Power, *Furry Families: Making a Human-Dog Family Through Home*, 9 SOC. & CULTURAL GEOGRAPHY 535, 536 (2008)).

[10] Livingston, *supra* note 2, at 819.

[11] *See* Squires-Lee, *supra* note 7, at 1069-70 ("The deep emotional attachment people feel for their companion animals embodies itself in a grief which can be the same in form and intensity as the grief . . . felt when a . . . friend or relative dies." (internal quotation marks omitted)).

[12] *See* Sabrina DeFabritiis, *Barking up the Wrong Tree: Companion Animals, Emotional Damages and the Judiciary's Failure to Keep Pace*, 32 N. ILL. U. L. REV. 237, 243-44 (2012) ("The human companion experiences a deep sense of loss upon the untimely death of the companion animal similar to that which is experienced following the death of a family member.").

[13] "Loss of companionship" is an element of tort damages awarded to a plaintiff to compensate him or her for the loss suffered after the defendant harms his or her loved one. *See* Andrew Boxberger, *The Missing Link in the Evolution of Law: Michigan's Failure to Reflect Society's Value of Companion Animals*, 5 T.M. COOLEY J. PRAC. & CLINICAL L. 139, 148 (2002) (noting loss of companionship damages were created in an attempt to fill the tremendous void created when a loved one dies); Kelly Wilson, Note, *Catching the Unique Rabbit: Why Pets Should be Reclassified as Inimitable Property Under the Law*, 57 CLEV. ST. L. REV. 167, 178 (2009) ("Loss of companionship can be one element in determining the value of a wrongful death of a family member to a living family member who experiences the loss."); *see also infra* Part II.

*Recovering for the Loss of a Beloved Pet*

human companions do not think of their companion animals as property,[14] leaving plaintiffs with limited recourse to recover for their loss.[15] Restricted by the property classification, plaintiffs can only recover the "fair market value" of their companion animals,[16] and loss of companionship claims are almost always unanimously dismissed.[17]

Second, under the history of loss of companionship and its predecessor, loss of consortium, recovery is limited to specific relationships. Most states have limited loss of companionship recovery to husbands and wives, with a few providing recovery for parents and children.[18] This treatment contradicts how many humans view their companion animals and the bonds between them. Consequently, it fails to fully compensate those who have been injured.[19]

Fortunately, a minority position is slowly gaining steam. In recent years, a small number of state legislatures and courts have allowed individuals to receive compensation for the loss of companionship of their injured or deceased companion animal. For example, Tennessee's "T-Bo Act" allows for recovery of up to $5000 in noneconomic damages for the negligent or intentional killing of a domesticated dog or cat under certain conditions,[20]

---

[14] *See* Simmons, *supra* note 3, at 281 ("[S]eventy-three percent of dog owners and sixty-five percent of cat owners consider their companion animals to be like a child or family member." (citing Rebecca J. Huss, *Separation, Custody, and Estate Planning Issues Relating to Companion Animals*, 74 U. COLO. L. REV. 181, 181 (2003))).

[15] *See* Jason R. Scott, Note, *Death to Poochy: A Comparison of Historical and Modern Frustrations Faced by Owners of Injured or Killed Pet Dogs*, 75 UMKC L. REV. 569, 569 (2006) ("[O]wners are limited in their courses of action and recovery should their property/pet/best friend be injured or even killed.").

[16] *See* Simmons, *supra* note 3, at 263 ("[D]amages for the death of a companion pet are fixed at . . . market value in most jurisdictions.").

[17] *See* Victor E. Schwartz & Emily J. Laird, *Non-Economic Damages in Pet Litigation: The Serious Need to Preserve a Rational Rule*, 33 PEPP. L. REV. 227, 241-42 (2006) (discussing how the vast majority of courts "do not permit . . . the pet's sentimental value or the owner's loss of companionship" to influence damages); *see also* Kaufman v. Langhofer, 222 P.3d 272, 279 (Ariz. Ct. App. 2009) ("Expanding Arizona common law to allow a pet owner to recover emotional distress or loss of companionship damages would be inappropriate . . . ."); Lachenman v. Stice, 838 N.E.2d 451, 467 (Ind. Ct. App. 2005) ("[T]he bottom line is that a dog is personal property, and the measure of damages for the destruction of personal property is the fair market value thereof at the time of the destruction.").

[18] *See infra* Part II; *see also* Squires-Lee, *supra* note 7, at 1082 ("[S]everal courts have expanded the traditional consortium claim to other close personal or familial relationships.").

[19] *See* Diane Sullivan & Holly Vietzke, *An Animal is Not an iPod*, 4 J. ANIMAL L. 41, 41-42 (2008) ("Our legal system just does not recognize the bond between people and their companion animals, and when that bond is severed, it completely fails to compensate for that loss.").

[20] TENN. CODE ANN. § 44-17-403 (West 2014).

while an Illinois statute allows plaintiffs to recover emotional and punitive damages for certain acts toward their animals.[21]

Additionally, some courts have also departed from the common law's market value recovery limit for the loss of a companion animal. In *Brousseau v. Rosenthal*, the New York County Civil Court acknowledged that "actual value to the owner" must be assessed, and in doing so, the court must consider loss of companionship.[22] Courts have also expressed their discontent with the property classification of companion animals: in *Corso v. Crawford Dog & Cat Hospital, Inc.*, a New York trial court recognized that "[a] pet is not an inanimate thing that just receives affection[,] it also returns it."[23]

While still a minority position,[24] what do these legislative and judicial actions mean for the legal classification of companion animals as property and the scope of loss of companionship damages claims? Can we justify the minority position within our current legal framework or must we rethink the law? This Comment will explore the recent minority developments, argue that they reflect a growing movement towards recognizing that companion animals are more than just property and that human companions deserve just compensation from our legal system, and consider two proposals outlining how the law could better address the loss of a companion animal.

Part I will review the classification of companion animals as property under U.S. law. After introducing the general concept of legal property, it will address the history and reasoning behind the property classification. Part I will then describe what this categorization means legally for human companions, including what happens during a tort suit for the injury to or killing of a companion animal and how human companions are compensated.

Part II will explore the development of and the intention behind loss of companionship damages claims in tort. This Part will include an overview of the recovery's origin, as well as the majority view of how it extends (or does not extend) to companion animals.

---

[21] 510 ILL. COMP. STAT. ANN. 70/16.3 (West 2014).

[22] 443 N.Y.S.2d 285, 286 (N.Y. Civ. Ct. 1980) ("[I]t would be wrong not to acknowledge the companionship and protection that Ms. Brousseau lost with the death of her canine companion of eight years."); *see infra* subsection III.B.1.a.

[23] 415 N.Y.S.2d 182, 183 (N.Y. Civ. Ct. 1979).

[24] For purposes of this Comment, "minority position" refers to the beliefs and rationales of those who advocate for allowing human companions to recover loss of companionship damages for the negligent or intentional injury to or killing of a companion animal. Supporters of the minority position believe human companions should be able to recover loss of companionship damages and advocate for one or both of the proposed solutions this Comment addresses: defining companion animals as "semi-property" and expanding loss of companionship damages for human companions.

With the important background information covered in Parts I and II, Part III will discuss the recent evolution of loss of companionship damages claims for companion animals across the United States. First, Part III will focus on specific laws enacted by state legislatures in Tennessee, Illinois, and Connecticut. Second, Part III will discuss common law court decisions covering both the acceptance and rejection of loss of companionship damages as well as the acceptance of recovery for other emotional damages.

Part IV will introduce popular arguments for the expansion of loss of companionship damages to compensate human companions. In support of the minority position are the arguments that awarding loss of companionship damages promotes the goals of tort law, is a natural next step, and is rational because companion animals currently receive different protections and treatment under various laws.

Finally, Part V will discuss two proposed solutions that will allow human companions to recover loss of companionship damages. First, this Part will consider a new special "semi-property" classification for companion animals, including oppositional arguments and responses in rebuttal. Second, it will explore a statutory scheme promoting the expansion of loss of companionship, including oppositional arguments and responses in rebuttal.

## I. COMPANION ANIMALS AS PROPERTY UNDER U.S. LAW

*Animals are defined as property because it is convenient—and profitable. This [definition] allows them to be exploited, harmed and used for experimentation and entertainment, all with impunity.*[25]

Whether or not you agree with this statement, animals, including companion animals, are indisputably categorized as property under the law.[26]

### A. *The History of Property and the Classification of Animals*

Property law in the United States is tied to the common law.[27] Under the common law, individuals have a "natural" right to their property, a right

---

[25] Sullivan & Vietzke, *supra* note 19, at 44.

[26] *See* Roukas, *supra* note 2, at 47 ("According to [U.S.] common law, animals are considered personal property.").

[27] *See id.* ("The U.S. legal framework on the law of property is a creature of the common law."); *see also* Thomas G. Kelch, *Toward a Non-Property Status for Animals*, 6 N.Y.U. ENVTL. L.J. 531, 533 (1998) ("In Anglo-American jurisprudence, the law of property has developed largely as common law.").

of absolute possession limited only by a few restrictions.[28] Property, as defined by *Black's Law Dictionary*, is "[a]ny external thing over which the rights of possession, use, and enjoyment are exercised."[29] Specifically, personal property is defined as "[a]ny movable or intangible thing that is subject to ownership" and does not include real property (e.g., land).[30]

Under U.S. common law, non-wild, domesticated animals—including the subcategory of companion animals—are considered to be their human owner's personal property.[31] The concept of classifying animals as property has roots deep within human history; many ancient cultures treated animals as property or "things."[32] While the common law did not always consider companion animals as property,[33] this view developed as dogs, specifically, began to be seen as valuable and useful to their owners. The legal status of property was soon thereafter attached;[34] and every state currently classifies companion animals as such.[35] This classification was typically codified by a statute or defined by the courts through the pronouncement that such animals were "chattel."[36] Therefore, the legal relationship between a

---

[28] Huss, *Valuing Man's and Woman's Best Friend*, *supra* note 1, at 68.

[29] BLACK'S LAW DICTIONARY 1410 (10th ed. 2014) (defining "property").

[30] *Id.* at 1411 (defining "personal property").

[31] *See generally* Roukas, *supra* note 2, at 47. Under U.S. law, animals are categorized as either "wild" or "domestic," and companion animals are considered a specific subdivision of domesticated animals. *Id.* at 48-49; *see also supra* note 1.

[32] *See* McNeely & Lindquist, *supra* note 5, at 109 ("Non-feral, domesticated dogs were treated as human personal property by particular ancient cultures."); *see also* Steven M. Wise, *Recovery of Common Law Damages for Emotional Distress, Loss of Society, and Loss of Companionship for the Wrongful Death of a Companion Animal*, 4 ANIMAL L. 33, 60 (1998) ("Since Roman times, law has partitioned the material world into things and persons . . . . At one time, women, children, human slaves, and nonhuman animals were all 'things' under Roman law."). The Holy Bible also addresses man's dominion over animals: "Then God said, Let Us make man in Our image, according to Our likeness; and let them have dominion over the fish of the sea, over the birds of the air, and over the cattle, over all the earth and over every creeping thing that creeps on the earth." *Genesis* 1:26 (internal quotation marks omitted).

[33] *See* Harold W. Hannah, *Animals as Property—Changing Concepts*, 25 S. ILL. U. L.J. 571, 575 (2001) ("[D]ogs were not regarded as property at common law . . . because dogs served no purpose but instead were kept merely for the 'whims and pleasures' of their owners."); *see also* Lisa Kirk, Comment, *Recognizing Man's Best Friend: An Evaluation of Damages Awarded When a Companion Pet is Wrongfully Killed*, 25 WHITTIER L. REV. 115, 118 (2003) ("The courts reasoned that dogs were not property because they served no specific purpose, being kept solely for the 'pleasure of their owners.'").

[34] *See* McNeely & Lindquist, *supra* note 5, at 110 ("Eventually, dogs came to be legally recognized as the personal property of humans . . . .").

[35] Seps, *supra* note 9, at 1342.

[36] *See* Elizabeth Paek, *Fido Seeks Full Membership in the Family: Dismantling the Property Classification of Companion Animals by Statute*, 25 U. HAW. L. REV. 481, 490-91 (2003) (describing chattel as "a term intended to cover every kind of personal property").

companion animal and a human companion is commonly one of property ownership.[37]

## B. *How the Property Classification Impacts Human Companions*

The holder of a property interest is entitled to certain legal rights. The right to use and enjoy one's property is minimally restricted, including a limitation on the use of one's property to harm another.[38] Generally, property can be "bought, sold, traded, gifted, devised, and bequeathed."[39] Like other forms of property, companion animals can be bought or sold, and human companions are granted "nearly unlimited authority" to make decisions regarding their companion animals.[40] Here, the law differentiates animals from other forms of property, affording them specific protections. The Animal Welfare Act[41] regulates the treatment of animals used in interstate or foreign commerce, including animals involved in research and exhibition, and every state has enacted animal anticruelty statutes.[42]

The classification of companion animals as property impacts the ability of a human companion to recover damages in a tort action for the negligent or intentional injury to or killing of a companion animal. The U.S. tort system allows for recovery against another person who intentionally or negligently injures or destroys one's personal property.[43] Property owners are generally refused noneconomic damages in tort cases[44] but can seek restitution, compensation for the injury or loss, against defendants to

---

[37] *Id.* at 491.

[38] *See* Huss, *Valuing Man's and Woman's Best Friend*, *supra* note 1, at 68 ("[A] person can not use his or her property to harm an innocent person . . . .").

[39] Seps, *supra* note 9, at 1342.

[40] Logan Martin, Comment, *Dog Damages: The Case for Expanding the Available Remedies for the Owners of Wrongfully Killed Pets in Colorado*, 82 U. COLO. L. REV. 921, 939 (2011); *see also id.* ("Pet ownership has many things in common with property ownership.").

[41] Animal Welfare Act of 1966, 7 U.S.C. §§ 2131–2159 (2012) (describing the Act's purpose, in part, as "insur[ing] that animals . . . are provided humane care and treatment").

[42] *See* Pamela D. Frasch et al., *State Animal Anti-Cruelty Statutes: An Overview*, 5 ANIMAL L. 69, 69 (1999) ("[T]hese laws do not afford animals legal rights [but they] provide . . . legal protection . . . to animals in our society."). For a paradigmatic example of a state anticruelty statute, see COLO. REV. STAT. § 18-9-202 (2014) ("A person commits cruelty to animals if he or she knowingly, recklessly, or with criminal negligence overdrives, overloads, overworks, torments, deprives of necessary sustenance, unnecessarily or cruelly beats [an animal], [or] allows [an animal] to be housed in a manner that results in chronic or repeated serious physical harm . . . .").

[43] *See* Adam P. Karp, *Causes of Action in Intentional Tort for Loss of or Injury to an Animal by a Human*, 44 CAUSES OF ACTION 2D 211, at § 30 (2010).

[44] *See* Goldberg, *supra* note 3, at 44 ("[N]oneconomic damages are generally not permitted for harm to property.").

restore them to the position they were in before the defendants' intentional or negligent act.[45]

In awarding monetary damages, courts look to compensate plaintiffs for "the loss sustained."[46] The most common way courts determine the plaintiff's loss is to price the property, including companion animals, by its fair market value.[47] Normally defined, fair market value is "the amount a willing buyer will pay for an item and the amount a willing seller will accept for the item where neither party is under compulsion to engage in the transaction."[48] If the companion animal is injured but not killed, the fair market value standard would compensate the plaintiff for the difference between the market value of the animal before and after the injury.[49] Courts analyze an animal's market value by looking at factors such as the species, breed, and pedigree.[50] Fair market value is intended to represent the value of what the plaintiff lost and the amount he or she would need to spend to purchase a replacement.[51] Unfortunately, unless a companion animal is a purebred breeding animal,[52] the animal most likely has little or no market value.[53] In such situations, some courts instead use the "actual value" or "intrinsic value" test to measure damages, factoring in previous expenditures and future economic losses to deduce the "actual value" of the animal to the

---

[45] *See* Carole Lynn Nowicki, Note, *The Animal Welfare Act: All Bark and No Bite*, 23 SETON HALL LEGIS. J. 443, 447 (1999) ("[A] property owner [can] seek restitution against anyone who damages his inanimate objects . . . ."); *see also* Livingston, *supra* note 2, at 817 (asserting that the traditional justification for using fair market value as the standard of compensation for destroyed personal property is to make the plaintiff whole).

[46] Karp, *supra* note 43, § 30.

[47] *See* Roukas, *supra* note 2, at 46 ("[T]he valuation of damages for the loss of a companion animal is measured as personal property and often times the fair market value."); *see also* Livingston, *supra* note 2, at 787 ("[T]ort law applie[s] personal property concepts to the valuation of animals."). Fair market value is often calculated by the value of the animal at the time of death or injury. Roukas, *supra* note 2, at 49.

[48] Livingston, *supra* note 2, at 784; *see also* Rebecca J. Huss, *Valuation in Veterinary Malpractice*, 35 LOY. U. CHI. L.J. 479, 514 (2003) [hereinafter Huss, *Valuation*] (citing the same definition of fair market value).

[49] Karp, *supra* note 43, § 30.

[50] Seps, *supra* note 9, at 1343. A court can establish fair market value by looking at the companion animal's purchase price, specialized skills or training, or future earnings the plaintiff could have made off of the animal (e.g., breeding). Huss, *Valuation*, *supra* note 48, at 514-15.

[51] Livingston, *supra* note 2, at 817.

[52] *See id.* at 789 ("[S]ome pets . . . do have a significant fair market value, especially purebred animals used for breeding purposes.").

[53] *See id.* ("[M]ost average cats and dogs have a negligible fair market value."); *see also* Pintar, *supra* note 1, at 756 (stating that the majority of companion cats and dogs have no market value, especially once a dog is no longer a puppy).

human companion.[54] Regardless of which method is used, most courts exclude sentimental value in their calculations. This Comment concentrates on the instances in which a court or legislature weighs sentimental value and allows recovery for loss of companionship.

## II. THE RECOVERY OF LOSS OF COMPANIONSHIP DAMAGES UNDER U.S. TORT LAW

Under U.S. tort law, loss of companionship has two meanings. First, loss of companionship can be raised as a specific cause of action against a defendant.[55] Second, loss of companionship may be recoverable as an element of damages calculated to award a plaintiff for his or her loss.[56] This Comment focuses on the latter of these two applications, and henceforth, loss of companionship will refer to this category of emotional damages under tort law.

Emotional damages are awarded for pain and suffering,[57] while loss of companionship damages are awarded specifically to help "fill the void" created by the loss of a loved one.[58] The reasons for recognizing this recovery are similar to the reasons supporting recovery for loss of consortium, the sister and predecessor to loss of companionship, and include the "loss of support or services, love, companionship, affection, [and] society" of another.[59] While loss of companionship was not always accepted at common law,[60] it is now generally used as a measure of damages under statutory wrongful death claims and common law loss of consortium claims.[61]

---

[54] *See* Schwartz & Laird, *supra* note 17, at 241. The "actual value" test will be described in greater detail in subsection III.B.1.

[55] *See* Wise, *supra* note 32, at 60-61 ("Separate from claims for emotional distress is the independent common law tort of loss of companionship.").

[56] *See* Wilson, *supra* note 13, at 178 ("Loss of companionship can be one element in determining the value of a wrongful death of a family member to a living family member who experiences the loss.").

[57] *See* Simmons, *supra* note 3, at 263 ("The court broadly defines emotional damages as pain and suffering.").

[58] Boxberger, *supra* note 13, at 148.

[59] Simmons, *supra* note 3, at 263.

[60] Roukas, *supra* note 2, at 51.

[61] *See* Wilson, *supra* note 13, at 178-79 ("[L]oss of companionship is . . . generally used as a measure in wrongful death and loss of consortium claims."); *see also* Anzalone v. Kragness, 326 N.E.2d 472, 475 (Ill. 2005) ("[The] loss of companionship of a spouse is recognized both pursuant to the Wrongful Death Act and at common law for loss of consortium resulting from nonfatal injuries to the spouse."); Vasiliki Agorianitis, Comment, *Being Daphne's Mom: An Argument for Valuing Companion Animals as Companions*, 39 J. MARSHALL L. REV. 1453, 1470 (2006) ("Loss of

The history of loss of companionship damages begins with the recovery of loss of consortium. Arising out of the marriage relationship,[62] loss of consortium was recognized early on as "the legal right of a husband to his wife's company."[63] Recovery was limited to husbands who had lost the "companionship and services of their wives due to the negligent or intentional acts" of a third person.[64] Over time, the recovery expanded to embrace the *emotional loss of either spouse* and to include the loss of affection and companionship.[65] Companionship came to be viewed as an "element of consortium," giving both spouses the right to enjoy the company and affection of their partner.[66]

More recently, some states and courts have recognized that loss of companionship recovery should extend to other important relationships, such as that of a parent and child.[67] At first, recovery was available only to a parent and only for economic damages (including a child's services or earning capacity).[68] This approach to recovery was seen as inadequate[69]

---

companionship is an element of damages traditionally included in the concept of consortium . . . .").

[62] *See* Agorianitis, *supra* note 61, at 1459 ("Loss of companionship is based on the concept of consortium, which arises out of the marriage relationship."); *see also* Wise, *supra* note 32, at 61 ("Loss of companionship is intimately related to traditional claims for loss of consortium derived from the marriage relationship . . . .").

[63] Kirk, *supra* note 33, at 130; *see also* Wise, *supra* note 32, at 60 ("Loss of consortium existed because a wife was considered her husband's servant, and both servants and wife were his chattels.").

[64] Wilson, *supra* note 13, at 179; *see also* Huss, *Valuing Man's and Woman's Best Friend*, *supra* note 1, at 91 ("Loss of consortium claims were originally limited to the material services that a wife provided in the home.").

[65] *See* Huss, *Valuation*, *supra* note 48, at 526 ("A more sentimental concept later developed that considered a spouse's loss of affection and companionship."); Squires-Lee, *supra* note 7, at 1082 ("Although historically based upon conjugal rights, a loss of consortium claim now includes the loss of companionship and affection as well."); Wilson, *supra* note 13, at 179 ("The right to recover on a loss of consortium claim has only been extended to wives within the last sixty years.").

[66] Kirk, *supra* note 33, at 122; *see also* Martin, *supra* note 40, at 943 ("[A] tortfeasor who causes the death of the plaintiff's spouse can be required to compensate the plaintiff for the loss of the spouse's 'affection, society, companionship, and aid and comfort.'").

[67] *See* Agorianitis, *supra* note 61, at 1459-60 ("[S]ome courts have . . . include[d] recovery based on such other relationships as parent and child."); *see also* Villareal v. Dept. of Transp., 774 P.2d 213, 216 (Ariz. 1989) ("Today, we . . . recognize a child's right to recover for the loss of parental consortium."); Norvell v. Cuyahoga Cnty. Hosp., 463 N.E.2d 111, 114 (Ohio Ct. App. 1983) ("The legislatively announced public policy now permits recovery by the parent for loss of [a] deceased child's society.").

[68] *See* Simmons, *supra* note 3, at 264 ("[C]ourts limited damages to economic losses—those losses that could be measured by a monetary standard.").

[69] Limiting recovery solely to economic damages was seen as inadequate because "the worth of a child decedent's life equates primarily with the value of that child's affection and companionship" instead of the services the child renders to his or her parents. Livingston, *supra* note 2, at 802.

*Recovering for the Loss of a Beloved Pet*

during the last half-century,[70] leading some courts and legislatures to decide that parents could recover for the loss of a deceased or injured child's companionship.[71] Children may also recover for the loss of parental consortium.[72] Today, scholars argue that loss of companionship should be extended to include the negligent or intentional killing of or injury to a companion animal.[73]

## III. THE EVOLUTION OF LOSS OF COMPANIONSHIP DAMAGES FOR COMPANION ANIMALS

Most jurisdictions deny human companions loss of companionship damages for the negligent or intentional killing of or injury to a companion animal. However, legislatures and courts have varied in how they address emotional damages for human companions.[74] This Part delves deeper into recent developments and discusses specific legislative actions and judicial decisions that are pushing, and in some instances breaking, the barriers of the old common law denial of recovery.

[70] For example, in Michigan, the Supreme Court first awarded loss of companionship damages for the death of a child in 1960. Boxberger, *supra* note 13, at 143-45. The right to receive such damages was later codified by the legislature in 1971. *Id.* In Illinois, the state Supreme Court allowed such damages first in 1984 in *Bullard v. Barnes*. 468 N.E.2d 1228, 1233 (Ill. 1984). In its decision, the Supreme Court of Illinois noted that fourteen states then allowed recovery by a parent. *Id.* at 1232.

[71] *See* Simmons, *supra* note 3, at 264 ("It was not until 1988 . . . that a growing number of states began recognizing that parents could have a claim of . . . loss of consortium for a child's injury or death."); *see also* Kirk, *supra* note 33, at 130-31 ("[C]ourts in a growing number of states have held that a parent's claim for loss of a child's comfort, society and companionship may be maintained where a minor child has been injured.").

[72] *See* Huss, *Valuation*, *supra* note 48, at 526 ("[S]everal states have recognized a child's claim for the loss of parental consortium."); Huss, *Valuing Man's and Woman's Best Friend*, *supra* note 1, at 92 (recognizing the same extension of recovery). The Supreme Court of Kentucky decided in 1997 that children should be allowed to recover damages for the loss of a parent. *Giuliani v. Guiler*, 951 S.W.2d 318, 319 (Ky. 1997). The court stated: "It is a natural development of the common law to recognize the need for a remedy for those children who lose the love and affection of their parents due to the negligence of another. It is necessary for this Court to conform the common law so as to provide a remedy for loss of consortium for children . . . ." *Id.*

[73] *See, e.g.*, Agorianitis, *supra* note 61, at 1470-71 (advocating for the expansion of loss of companionship recovery to cover companion animals).

[74] *Compare* Wise, *supra* note 32, at 69 ("Historically, owners of companion animals were denied common law damages for emotional distress and loss of society for the wrongful deaths of their companion animals . . . ."), *with* Kirk, *supra* note 33, at 120 ("Courts have been inconsistent in their recognition of the sentimental value of a pet to an owner who has lost his or her companion."), *and* McNeely & Lindquist, *supra* note 5, at 110 ("Currently, there is an undeniable philosophical shift emerging within the judicial system which is struggling with whether or not it should continue to treat dogs as the personal property of humans, and if not, just exactly how should they be legally treated.").

## A. *Legislative Developments*

> *If a change in the law is to occur, it is up to the Legislature, not the Courts, to decide that a dog named Fido, a cat named Boots, a hamster named Harry, or a fish called Wanda can have some new species of personal injury action brought on their behalf.*[75]

Courts and advocates alike have noted that state legislatures are best suited to address the expansion of tort recovery. Denying recovery for negligent infliction of emotional distress for the plaintiff's deceased dog in *Rabideau v. City of Racine*, the Supreme Court of Wisconsin noted that the legislature was the proper forum to "make a considered policy judgment regarding the societal value of pets as companions and to specify the nature of the damages to be awarded in a lawsuit."[76] A few state legislatures have made such policy judgments, enacting statutes expanding a human companion's ability to recover emotional damages.

### 1. Tennessee

In 2000, Tennessee became the first state to pass a law allowing for the recovery of noneconomic, emotional damages, including the loss of companionship, for the intentional or negligent killing of a companion animal.[77] Known as the "T-Bo Act," the original bill was introduced after State Senator Steve Cohen's shih tzu, T-Bo, was killed by another dog.[78] After learning that his recovery was limited to the market value of T-Bo and his veterinary expenses, Cohen introduced the bill that would later become law.[79]

Recovery is allowed when a pet[80] dog or cat is killed due to the "unlawful and intentional, or negligent, act of another."[81] If the act was

---

[75]  Naples v. Miller, No. 08C-01-093, 2009 WL 1163504, at *3 (Del. Super. Ct. Apr. 30, 2009).

[76]  627 N.W.2d 795, 807 (Wis. 2001).

[77]  W.C. Root, Note, *"Man's Best Friend": Property or Family Member? An Examination of the Legal Classification of Companion Animals and its Impact on Damages Recoverable for Their Wrongful Death or Injury*, 47 VILL. L. REV. 423, 435 (2002); *see also* DeFabritiis, *supra* note 12, at 256 ("Tennessee was the first state to adopt a statute expressly authorizing the recovery of non-economic damages for the death of a companion animal.").

[78]  *Honoring Animal Victims: Landmarks in Legislation*, ANIMAL L. DEF. FUND (Feb. 10, 2009), http://www.aldf.org/downloads/ALDF_Honoring_Animal_Victims_Landmarks.pdf, *archived at* http://perma.cc/H24N-C86L.

[79]  *Id.*; *see also* Scott, *supra* note 15, at 588 (telling the story behind the enactment of the T-Bo Act).

[80]  Under Tennessee law, "pet" is defined as "any domesticated dog or cat normally maintained in or near the household of its owner." TENN. CODE ANN. § 44-17-403(b) (2014).

negligent, the incident must have occurred on the plaintiff's property or while under his or her "control or supervision."[82] Recovery of noneconomic damages, including "compensation for the loss of the reasonably expected society, companionship, love and affection of the pet," is capped at $5000.[83] While revolutionary in many respects, the statute contains strict applicatory restrictions. Besides applying only to killed or fatally injured dogs and cats and capping recoverable damages, the T-Bo Act exempts not-for-profit organizations and governmental agencies, including their employees, acting for the public health or animal welfare, and negligent killings by licensed veterinarians.[84] Nevertheless, the T-Bo Act is viewed as the first statute of its kind advancing the rights of human companions to recover for the loss of their pets' companionship.[85]

### 2. Illinois

Illinois is the only other state besides Tennessee that currently allows the recovery of noneconomic, emotional damages after the loss of a companion animal.[86] Illinois's Humane Care for Animals Act,[87] codified two years after the enactment of Tennessee's T-Bo Act,[88] covers *all* animals[89] that are subject to acts of cruelty, torture, or impounded in bad faith.[90] An individual may recover, "but [is] not limited to, the monetary value of the animal, veterinary expenses [, and] . . . any other expenses [to] rectify[] the effects of the cruelty, pain, and suffering of the animal, and *emotional*

---

[81] *Id.* § 44-17-403(a)(1) ("If a person's pet is killed or sustains injuries that result in death caused by the unlawful and intentional, or negligent, act of another or the animal of another, the trier of fact may find the individual causing the death or the owner of the animal causing the death liable . . . .").

[82] *Id.; see also* Goldberg, *supra* note 3, at 60-61 ("Tennessee's statute applies only to pets negligently injured or killed on the property of their owners, such as in their backyards, or under the owner's control, such as on a leash.").

[83] TENN. CODE ANN. § 44-17-403(a)(1), (d). Section (c) clarifies that the cap on damages does not cover claims for intentional infliction of emotional distress. *Id.* § 44-17-403(c).

[84] *Id.* § 44-17-403(e).

[85] *See* Root, *supra* note 77, at 435 ("The T-Bo Act is a positive development for companion animal owners because it expands available damages.").

[86] Goldberg, *supra* note 3, at 60.

[87] 510 ILL. COMP. STAT. ANN. 70/16.3 (West 2014).

[88] DeFabritiis, *supra* note 12, at 257.

[89] The statute does not limit its application to "pets," "companion animals," or "dogs and cats." *Id.* ("[I]n Illinois a human companion may recover for *any animal* to which a person has a right of ownership—recovery is not limited to dogs and cats.").

[90] 510 ILL. COMP. STAT. ANN. 70/16.3.

*distress suffered by the owner.*"[91] Plaintiffs are also entitled to punitive damages ranging from $500 to $25,000 for each covered act.[92]

The Illinois law is more expansive than the Tennessee statute in some respects while more restrictive in others. On one hand, the Illinois law allows recovery for human companions of animals other than dogs and cats, provides recovery even if the companion animal is non-fatally injured,[93] and includes recovery not only for emotional distress but also for veterinary and other financial expenses.[94] On the other hand, the Illinois law is more restrictive in that it specifies only certain acts of an aggressor for which recovery is available[95] and does not allow recovery for injuries resulting from a third party's negligence.[96]

### 3. Connecticut

Because they permit recovery for emotional damages in some pet lawsuits, the Tennessee and Illinois statutes are unique among state laws. However, other states have taken small steps along the road to expanding recovery for human companions mourning the loss of their companion animals. One of those states is Connecticut.

Connecticut law dictates that one who "intentionally kills or injures a companion animal," defined as a dog or cat,[97] is liable for *economic damages* including veterinary care, fair value of the animal, and burial expenses.[98] A court may also award punitive damages and attorneys' fees following statutory limits; however, these may not be imposed upon a licensed veterinarian, a state employee or officer, or an animal cruelty or animal protection volunteer if the defendant was acting within the scope of his or

---

[91] *Id.* (emphasis added).

[92] *Id.*

[93] *Id.*; *see also* Rebecca J. Huss, *Recent Developments in Animal Law*, 40 TORT TRIAL & INS. PRAC. L.J. 233, 248 (2005) [hereinafter Huss, *Recent Developments*] (describing the scope of the Illinois law).

[94] 510 ILL. COMP. STAT. ANN. 70/16.3; *see also* Scott, *supra* note 15, at 588 (discussing the contents of the Illinois law).

[95] 510 ILL. COMP. STAT. ANN. 70/16.3; *see also* Huss, *Recent Developments*, *supra* note 93, at 248 ("[T]he animal must have been subject to an act of aggravated cruelty or torture or have been impounded in bad faith.").

[96] 510 ILL. COMP. STAT. ANN. 70/16.3; *see* Goldberg, *supra* note 3, at 60 ("In Illinois, the law applies only to acts of aggravated cruelty, torture, or bad faith, not negligence.").

[97] CONN. GEN. STAT. ANN. § 22-351a(a) (West 2014) ("'[C]ompanion animal' means a domesticated dog or cat that is normally kept in or near the household of its owner or keeper and is dependent on a person for food, shelter and veterinary care . . . .").

[98] *Id.* § 22-351a(b).

her employment. [99] Unlike the Tennessee and Illinois statutes, the Connecticut statute does not allow for the recovery of noneconomic, emotional damages. [100] However, the Connecticut statute still represents a step in the right direction.

Though statutes like those in Tennessee, Illinois, and even Connecticut are few and far between, there has been an increase in proposed state legislation pushing for emotional damages for the injury to or killing of a companion animal. [101] The statutes discussed here may inspire more states to expand human companions' ability to recover emotional damages.

### B.  Common Law Developments

The vast majority of courts have ruled that damages should be limited to the fair market value of the companion animal and have denied the recovery of emotional damages, including compensation for loss of companionship. [102] A few courts have broken from this tradition and allowed damages to reflect the sentimental value of the companion animal, with some courts specifically including damages for loss of companionship. This Section will review important cases that have pushed the boundaries of recovery as well as cases where courts have maintained the status quo.

#### 1.  The Acceptance of Loss of Companionship Damages as Part of the "Actual Value" of a Companion Animal

When a court rejects the fair market value test, it often turns to an "actual value" or "intrinsic value" measurement of damages. [103] The court may then factor in the animal's original purchase price, money spent during

---

[99] *See id.* § 22-351a(c)-(d) (stating that to escape possible punitive damages, licensed veterinarians must have followed "accepted standards of practice").

[100] *See* Goldberg, *supra* note 3, at 61 (defining the allowable damages).

[101] *See* Agorianitis, *supra* note 61, at 1461 (describing legislative proposals that would allow for damages in the wrongful death or injury of companion animals). For a review of proposed legislation in other states, see Elaine T. Byszewski, Comment, *Valuing Companion Animals in Wrongful Death Cases: A Survey of Current Court and Legislative Action and a Suggestion for Valuing Pecuniary Loss of Companionship*, 9 ANIMAL L. 215, 226-30 (2003) (discussing proposed legislation, at the time of publication, in states such as California, Colorado, New York, and Rhode Island, as well as failed bills in Maryland, Oregon, and Connecticut).

[102] *See supra* Section I.B.

[103] *See* Huss, *Valuing Man's and Woman's Best Friend*, *supra* note 1, at 89 ("A state may allow for the elevation of damages based on the 'actual or intrinsic value of the animal.'"); *see also* Kirk, *supra* note 33, at 119 ("In some jurisdictions, where the dog is found not to have market value, courts look to its actual, intrinsic value to the owner."); Schwartz & Laird, *supra* note 17, at 240-41 (stating that some courts may allow recovery of the value to the owner if market value cannot be calculated).

the animal's life (e.g., veterinary bills), training costs, and loss of future income from the animal (e.g., special services or breeding) into the damages calculation.[104] The actual value standard recognizes that companion animals have value beyond the open market.[105] A vast majority of courts using "actual value" will exclude sentimental value—including the loss of companionship—from their damages calculations. [106] Other courts, however, include sentimental value, "the feelings or emotions in connection with 'normal' feelings of loss,"[107] with some courts going as far as to explicitly factor in loss of companionship as part of the actual value of the companion animal.[108]

### a. *New York*

In computing damages for the death of an eight-year-old dog, the trial court in *Brousseau v. Rosenthal* held that "actual value" to the owner was the correct measurement of damages.[109] In finding for the plaintiff, who had depended greatly on the dog given to her as puppy after she lost her husband, the court held that it "must consider [loss of companionship] as an element of the dog's actual value" to the plaintiff.[110] To the *Brousseau* court, ignoring the companionship and protection the deceased animal provided to the plaintiff would be "wrong."[111] *Brousseau* has long been cited as an exemplary case modeling the acceptance of damages for loss of companionship of a companion animal.[112]

---

104  Schwartz & Laird, *supra* note 17, at 241.

105  *See id.* at 242 (calling this method of calculation a "more elastic standard").

106  *See id.* (citing the justification that these factors are "inherently subjective, easily inflatable, and potentially astronomical").

107  Huss, *Valuing Man's and Woman's Best Friend*, *supra* note 1, at 90; *see also* Livingston, *supra* note 2, at 839 ("When a pet dies prematurely because of another's wrongful act, we experience the loss of [the companionship of our pet] as a genuine injury.").

108  *See* Huss, *Valuation*, *supra* note 48, at 527 ("A few cases have held that loss of companionship can be one factor in calculating the actual value of an animal."); *see also* Casey Chapman, Comment, *Not Your Coffee Table: An Evaluation of Companion Animals as Personal Property*, 38 CAP. U. L. REV. 187, 194 (2009) ("Some courts have even gone further and taken a more liberal 'value to the owner' approach, allowing damages for sentimental or subjective value of a pet.").

109  443 N.Y.S.2d 285, 286 (N.Y. Civ. Ct. 1980) ("[T]he fact that Ms. Brousseau's dog was a gift and a mixed breed and thus had no ascertainable market value need not limit [her] recovery to a merely nominal award.").

110  *Id.* ("The testimony indicates that plaintiff relied heavily on this well-trained watch dog and never went out into the street alone at night without the dog's protection. Since the dog's death, plaintiff does not go out of her apartment after dark.").

111  *Id.* at 286-87.

112  *See, e.g.*, Agoranitis, *supra* note 61, at 1460 (highlighting *Brousseau* as an example of a court allowing loss of companionship damages to a human companion).

In calculating damages for a negligently killed Yorkshire terrier, Dexter, a New York state court in *Mercurio v. Weber* embarked on a similar analysis as in *Brousseau*.[113] Stating that *Brousseau's* analysis was "preferable" to others, the court decided that "considering the loss of companionship . . . more accurately values the lost animal" and provides for proper compensation.[114] Here, the court accepted the "replacement" price of Dexter offered by plaintiff; although the amount ($1513.58) was "substantially higher" than Dexter's purchase price, the court presumed loss of companionship was factored into the figure and agreed it was still a reasonable estimate of Dexter's value.[115] *Mercurio* thus reflects the proposition that loss of companionship can be factored into the replacement cost of a companion animal.[116]

b. *Illinois*

> *A recurring problem in cases of this sort is whether and to what extent the owner of an item of personal property having no market value should be allowed to recover for the sentimental value which he attached to the item.*[117]

In the 1987 case of *Jankoski v. Preiser Animal Hospital*, the plaintiffs sued to recover damages for loss of companionship after the death of their German Shepard due to the negligent administration of anesthesia.[118] Acknowledging *Brousseau*, the *Jankoski* court was unwilling to recognize loss of companionship as an independent cause of action but stated that, in calculating damages, an object without market value should be measured under the "actual value" standard and "may include some element of sentimental value."[119]

---

113 No. 1113/03, 2003 WL 21497325, at *2 (Nassau Cnty. Dist. Ct. June 20, 2003).

114 *Id.*

115 *See id.* ("[T]he cost of replacing Dexter . . . is not an unreasonable estimate of Dexter's market value . . . . [T]he record indicates that plaintiff grew highly attached to Dexter, and was subsequently deprived of his companionship. Pricing companionship is inherently difficult, but since plaintiff has presented us with a figure that reasonably approximates the cost of replacing Dexter . . . the court accepts that as the fair market price of Dexter.").

116 *See* Huss, *Recent Developments, supra* note 93, at 240 (explaining that "the replacement cost of the dog encompassed the loss of companionship" in *Mercurio*).

117 Jankoski v. Preiser Animal Hosp., 510 N.E.2d 1084, 1086 (Ill. App. Ct. 1987) (internal quotation marks omitted).

118 *Id.* at 1084-85.

119 *Id.* at 1087 (hoping to avoid awarding only "nominal" damages to deserving plaintiffs).

2. The Rejection of Loss of Companionship Damages Under the Actual Value Test and Due to the Property Classification of Animals

While New York and Illinois courts, in *Brousseau*, *Mercurio*, and *Jankoski*, accepted loss of companionship as an element of either actual value or replacement value, other courts applying the "actual value" theory of recovery have explicitly rejected the recovery of damages for sentimental value.[120] Instead, these courts factor only "the cost of replacement, money spent on veterinary care, training costs, and loss of potential income" into damages.[121]

a. *Ohio*

In *McDonald v. Ohio State University Veterinary Hospital*, an Ohio court dealt with assigning damages for a German Shepherd that suffered paralysis after surgery.[122] The dog, Nemo, had won awards at various dog shows and his pedigree had made him desirable for breeding.[123] Deciding that the proper test for damages was value to the owner, the court held that sentimentality was not a recoverable element under this standard.[124] Instead, the court took into account the time and money spent training Nemo,[125] potential lost earnings, and Nemo's "uniqueness" to conclude that plaintiff suffered damages of $5000.[126]

b. *Alaska*

In *Mitchell v. Heinrichs*, the Supreme Court of Alaska held that actual value to the owner, instead of market value, might sometimes be the proper measurement of damages for a companion animal.[127] The court listed

---

[120] *See* Huss, *Valuing Man's and Woman's Best Friend*, *supra* note 1, at 90 ("Some of these courts assessing the actual value of animals have specifically stated that the value does not include the subjective emotional or sentimental value of the animal."); *see also* Goldberg, *supra* note 3, at 35 ("[C]ourts have been clear that [actual or intrinsic value] include[s] only economic factors, not sentiment or emotion.").

[121] Seps, *supra* note 9, at 1344.

[122] 644 N.E.2d 750, 751 (Ohio Ct. Cl. 1994).

[123] *Id.* (noting that Nemo's puppies earned the plaintiff $350-500 each).

[124] *See id.* at 752 ("Sentimentality is not a proper element in the determination of damages caused to animals.").

[125] *See id.* ("Plaintiff invested great time and effort to train Nemo, a unique pedigree, in a particular and personalized fashion—the rigorous Schutzhund training.").

[126] *Id.*

[127] 27 P.3d 309, 310-11, 313 (Alaska 2001) (involving the death of the plaintiff's dog by defendant's gun shot after the dog threatened the defendant's livestock and her own personal safety).

potential items eligible for recovery under this theory: original cost and cost of replacement, including cost of immunization, neutering, and training of a replacement animal.[128] The court held that sentimental value was not a component of actual value.[129]

### c.  *Texas*

In *Petco Animal Supplies v. Schuster*, the trial court originally awarded the plaintiff $10,000 for "intrinsic value—loss of companionship," as well as additional recovery for mental anguish, emotional distress, and economic damages for the loss of her dog, Licorice.[130] On appeal, the court decided the plaintiff could not recover for loss of companionship.[131] Citing to *Heiligmann v. Rose*, the court held that a plaintiff could only recover the market value or "special or pecuniary value to the owner" related to the animal's services.[132] Although the court conceded that intrinsic value was "a personal or sentimental value," the intrinsic value of a companion animal was confined to the usefulness and services of the animal by Texas precedent.[133] The court noted: "[W]e are not free to mold Texas law as we see fit but must instead follow the precedents of the Texas Supreme Court unless and until the high court overrules them or the Texas Legislature supersedes them by statute. Thus, we follow *Heiligmann* . . . ."[134]

### d.  *Indiana*

In *Lachenman v. Stice*, the property classification of companion animals hindered the plaintiff from offering evidence regarding the deceased dog's sentimental value.[135] While the court accepted that companion animals might have "worth" beyond market value, the court ultimately concluded that "a dog is personal property, and the measure of damages for the

---

[128] *Id.* at 313-14.

[129] *See id.* at 314 ("Mitchell may not recover damages for her dog's sentimental value as a component of actual value to her as the dog's owner.").

[130] 144 S.W.3d 554, 558 (Tex. Ct. App. 2004).

[131] *See id.* at 560 ("Petco asserts that the district court could not, as a matter of law, award Schuster damages for . . . loss of companionship . . . . We agree.").

[132] *Id.* at 561 (citing Heiligmann v. Rose, 16 S.W. 931, 932 (Tex. 1891)).

[133] *Id.* at 563-64 ("Schuster relies on *Porras v. Craig* for the proposition that she can recover the intrinsic value of Licorice as a beloved companion. But . . . *Heiligmann*'s true rule permitted recovery of a dog's special or pecuniary value ascertained solely *by reference to the usefulness and services of the dog*." (citing *Heiligmann*, 16 S.W. at 932) (internal quotation marks omitted)).

[134] *Id.* at 565.

[135] *See* 838 N.E.2d 451, 466 (Ind. Ct. App. 2005) (affirming that case law does not support the plaintiff's claim that she may recover damages in excess of the fair market value of her dog).

destruction of personal property is the fair market value thereof at the time of the destruction."[136] Therefore, a trial court could exclude evidence relating to the sentimental value of a companion animal.[137]

### 3.  The Acceptance of Other Emotional Damages

The next two cases, while not specifically addressing loss of companionship damages, acknowledged sentimental value and allowed plaintiffs to recover noneconomic, emotional damages. Thus, they are positively related to this Comment's purpose.

#### a.  *Florida*

In one of the most well-known companion animal cases, the plaintiff in *La Porte v. Associated Independents, Inc.* filed suit after witnessing a garbage collector hurl a garbage can at her miniature dachshund, inflicting injuries from which the dog died.[138] After the trial judge instructed the jury that the plaintiff could recover for mental suffering from the incident, the Florida Supreme Court was faced with the question of whether the trial court erred in giving out these instructions.[139] The court rejected the District Court of Appeal's remarks that sentimental value had no place in damages calculations and reinstated the original judgment.[140] Writing that "the affection of a master for his dog is a very real thing and . . . the malicious destruction of the pet provides an element of damage for which the owner should recover,"[141] the court held that the plaintiff could recover for mental suffering as an element of her damages.[142]

---

[136] *Id.* at 467.

[137] *See id.* at 467-68 ("A family dog may well have sentimental value . . . [but] we cannot say that the trial court's ruling . . . was in error.").

[138] 163 So. 2d 267, 267-68 (Fla. 1964).

[139] *Id.* at 267.

[140] *Id.* at 268-69.

[141] *Id.* at 269 ("The restriction of the loss of a pet to its intrinsic value in circumstances such as the ones before us is a principle we cannot accept.").

[142] *Id.*; *see* Byszewski, *supra* note 101, at 219-20 ("The court's holding recognized that companion animals do have special value, unlike traditional property, based on the value their guardians appropriately place on them." (internal quotation marks omitted)). The judgment reinstated by the Florida Supreme Court was for $2000 in compensatory damages, "primarily emotional in nature," and $1000 in punitive damages. William A. Reppy, Jr., *Punitive Damage Awards in Pet-Death Cases: How do the Ratio Rules of* State Farm v. Campbell *Apply?*, 1 J. ANIMAL L. & ETHICS 19, 30 (2006).

### b. *Hawaii*

A Hawaiian circuit court in *Campbell v. Animal Quarantine Station* awarded the grieving family of a negligently killed dog $1000 in damages, which included recovery for emotional distress.[143] On appeal to the Supreme Court of Hawaii, defendant argued the plaintiffs could not recover for mental injury from the loss of personal property.[144] Admitting that it was following a minority view, the court rejected this argument, stating that a plaintiff could recover for mental distress due to the "negligent destruction of property," and upheld the original damages award.[145] *Campbell* reflects the coexistence of an unlikely pairing: the property classification of companion animals and the approval of emotional compensation.[146]

## IV.  THE MINORITY TREND: ARGUMENTS FOR EXPANDING LOSS OF COMPANIONSHIP DAMAGES TO COVER COMPANION ANIMALS

> *[A] pet is not just a thing but occupies a special place somewhere in between a person and a piece of personal property.*[147]

This Part addresses three major arguments in support of the minority position and the expansion of tort law to allow the recovery of loss of companionship damages for a companion animal.

### A.  *Expansion Promotes the Goals of Tort Law*

Three major goals of tort law are to deter wrongful conduct, compensate victims, and reflect society's values.[148] First, to deter potential wrongdoers, the law must present a punishment harsh enough to evoke deterrence. Tort law will not deter wrongful conduct toward companion animals unless

---

[143]  632 P.2d 1066, 1067 (Haw. 1981).

[144]  *Id.* at 1071; Root, *supra* note 77, at 433-34.

[145]  *Campbell*, 632 P.2d at 1071 ("Hawaii has devised a unique approach to the area of recovery for mental distress.").

[146]  *See* Root, *supra* note 77, at 434 ("This case might be used as a springboard for other courts to adopt the same or similar legal reasoning to expand the damages recoverable for the wrongful injury to or death of a companion animal.").

[147]  Corso v. Crawford Dog & Cat Hosp., Inc., 415 N.Y.S.2d 182, 183 (N.Y. Civ. Ct. 1979).

[148]  *See* Squires-Lee, *supra* note 7, at 1099 (listing "compensation, deterrence, and the reflection of societal values" as tort law's three objectives); *see also* Boxberger, *supra* note 13, at 142 ("Two of the main objectives of tort law are the affirmation of societal values and the compensation for people's injuries.").

*University of Pennsylvania Law Review* [Vol. 163: 1199

courts appropriately value the animal.[149] An appropriate valuation must involve emotional harm; without it, plaintiffs will recover negligible damages under both the fair market value and actual value standards, which will not deter future wrongdoers. Economic deterrence functions successfully only if compensation is high enough to curb the punishable conduct. For companion animals, compensation therefore must include emotional damages, including loss of companionship.[150]

Second, to properly compensate tort victims for their actual loss, courts must award loss of companionship damages. Fair market value is not a sufficient measurement of damages for the true loss suffered by human companions.[151] Proponents demand that the unique relationship humans have with their companion animals requires greater compensation than that given for the damage or destruction to other forms of property: "[T]he most fundamental rule of damages [is] that every wrongful injury or loss . . . should be adequately and reasonably compensated[,] requir[ing] . . . compensation for the reasonable special value of such articles to their owner taking into consideration the feelings of the owner for the property."[152] Human companions suffer emotional distress, grief, depression, and loss of society when their companion animal is injured or killed.[153] The loss experienced is "substantial and genuine," and studies have found this emotional distress is similar to that experienced when a human family member dies.[154] These are real harms that deserve emotional damages for plaintiffs to recover fully for their injury.[155] Without such recognition, the

---

[149] *See* Squires-Lee, *supra* note 7, at 1087 ("Appropriately valuing companion animals . . . results in deterrence by reducing consumption.").

[150] *See id.* at 1086 ("[E]conomic deterrence requires compensation for emotional harm . . . .").

[151] *See id.* at 1062-63 ("Market value is incommensurate with the loss suffered by animal guardians because the market value of a cat or dog, neither pedigreed nor kept for a purpose other than love and affection, is negligible.").

[152] Wise, *supra* note 32, at 66.

[153] *See id.* at 39 ("[A]n overarching principle of tort law is that victims should be compensated for all damages proximately caused by a tortfeasor's wrongful conduct; human companions suffer proximately caused emotional distress and loss of society when their companion animals are wrongfully killed; therefore, owners should be compensated for this emotional distress and loss of society."); *see also* Martin, *supra* note 40, at 941 ("Owners . . . can be expected to go through all of the classic stages of grief when their pets die, including denial, bargaining, anger, guilt, sorrow, and resolution.").

[154] Livingston, *supra* note 2, at 806 ("Upon a pet's death, humans generally experience a substantial and genuine loss . . . ."); Pintar, *supra* note 1, at 741 ("Individuals grieving over the loss of a pet will experience the same symptoms as those grieving over the loss of a person, though not necessarily to the same degree.").

[155] *See* Boxberger, *supra* note 13, at 142 ("Michigan's refusal to compensate companion animal guardians for loss of companionship for the loss of a companion animal is a failure to compensate for a very real and devastating injury."); *id.* at 150 ("That destruction and loss is evident by the

law "awards damages for a loss that the owner of a companion animal *does not actually suffer* (economic value) and refuses to compensate an owner for the damages that [he or she] actually *does suffer* (emotional distress and loss of society)."[156]

The third goal of tort law is to reflect society's values.[157] Proponents argue that the current law does not reflect society's attitudes: people do not view their companion animals as property.[158] Studies indicate that many human companions view their companion animals as members of the family, with some even viewing their beloved animals as akin to children.[159] Furthermore, the idea that society values companion animals as more than property is reflected by the concept of "replacement." One standard of tort compensation for property harm is awarding the plaintiff the cost of replacement. However, a companion animal is irreplaceable, and the actions of a human companion after his or her loss do not match those of a person dealing with damaged or destroyed property.[160] With other forms of property, when the item is rendered useless, the owner seeks to replace it, an act that makes the owner "whole again." However, purchasing a new companion animal does not make the human companion whole.[161] Even more telling, if companion animals were viewed like property, the animal would be replaced once the cost of upkeep surpassed the animal's market value. However, the opposite occurs: human companions see their animals as *more valuable* as they age and will pay to keep the animal alive as long as possible.[162]

---

extreme pain felt by the human companion."); *see also* Chapman, *supra* note 108, at 203 ("[I]t is illogical to hold the innocent party responsible for any losses incurred due to the negligence of the offending party.").

156  Wise, *supra* note 32, at 72.

157  *See* Huss, *Valuation, supra* note 48, at 530 ("The law should reflect the values of society.").

158  *See supra* note 14 and accompanying text. Some proponents go as far as to say companion animals should be treated as persons under the law. *See* Seps, *supra* note 9, at 1358 ("Since society treats pets like humans, the law should treat this group of animals as persons.").

159  DeFabritiis, *supra* note 12, at 241-42; *see also* Livingston, *supra* note 2, at 802 ("[A]nimals are now often regarded as members of the family and esteemed for the love, loyalty, and companionship that they provide.").

160  *Cf.* Wilson, *supra* note 13, at 196 (noting that a companion animal is of "irreplaceable value" to the human companion).

161  *See* Livingston, *supra* note 2, at 817 ("[P]rocuring a new animal will not erase the mental anguish and grief experienced when the previous animal was killed.").

162  *See* Seps, *supra* note 9, at 1365 ("[A]s pets age they become more valuable to their owners as a result of having spent more time with their owners and thus developing a closer emotional relationship with them."); *see also* Simmons, *supra* note 3, at 265 ("If animals were truly seen as property[,] veterinarians and other animal healthcare providers would be nonexistent. Pet owners would not need their services because they would simply abandon their pets and replace

### B. *Expansion Is a Natural Next Step*

In many ways, allowing for the recovery of loss of companionship damages under tort law makes sense as the next natural development in the law. Over time, more relationships have been declared eligible to receive loss of companionship damages.[163] Currently, the common law and state statutes conflict with how the public views and values companion animals. To address this inconsistency, states must recognize loss of companionship damages for human companions.[164] "As long as tort law compensates for emotional losses stemming from other relationships, it should compensate for emotional losses stemming from the death of companion animals."[165]

### C. *Expansion Is Rational Because Companion Animals Already Receive Protection Unique to "Property" Under the Law*

Although classified as property, animals receive various forms of protection under U.S. law, which differentiates them from other forms of property. For example, animals receive unique protection though animal cruelty and welfare laws.[166] The Animal Welfare Act of 1966 was enacted in part to "insure that animals intended for use inside research facilities . . . or . . . as pets are provided humane care and treatment" and "assure the humane treatment of animals during transportation in commerce."[167] As author Debra Squires-Lee argues in her 1995 article, *In Defense of Floyd: Appropriately Valuing Companion Animals in Tort*, "[i]f animals were truly property, there would be little reason for Congress to pass such a law protecting their interests . . . ."[168] Squires-Lee also notes that all fifty states have passed laws criminalizing animal cruelty, torture, the overworking of animals, and the deprivation of necessary sustenance.[169]

---

them . . . rather than seeking treatment." (quoting Paek, *supra* note 36, at 489) (internal quotation marks omitted)).

  163  *See supra* Part II.

  164  *See* Kirk, *supra* note 33, at 131 ("[I]t is time for the courts to recognize that many members of society have emotional bonds with their companion animals."); *see also* Boxberger, *supra* note 13, at 150 ("Michigan is willing to award loss of companionship damages for the loss of a family member and any break up in the family unit. Accordingly, Michigan must award loss of companionship damages for the loss of a companion animal. Not allowing such damages is hypocritical and unjust.").

  165  Squires-Lee, *supra* note 7, at 1082-83.

  166  *See* Goldberg, *supra* note 3, at 45 (pointing out that animal cruelty and welfare laws show that companion animals are valued even though they are classified as legal property).

  167  7 U.S.C. § 2131 (2012).

  168  Squires-Lee, *supra* note 7, at 1072.

  169  *See id.* at 1071-72 ("[T]he legislatures of the fifty states have essentially acknowledged that animals are more than property and more than inanimate objects.").

*Recovering for the Loss of a Beloved Pet*

The protection of companion animals in these respects fundamentally conflicts with the lack of recovery for emotional damages under tort law.[170]

## V. PROMOTING THE MINORITY VIEW: APPROACHES TO EXPANDING TORT RECOVERY TO INCLUDE LOSS OF COMPANIONSHIP DAMAGES TO HUMAN COMPANIONS

For those supporting the growing minority view, two approaches are often proposed to change the law. First, the legal status of companion animals must be elevated from pure property to a semi-property classification more attuned with the realities of companion animals' characteristics and their relationships with their human companions. Second, tort law itself must expand to allow for the recovery of loss of companionship damages to human companions.

Advocates of the minority position encourage one or both of these proposed solutions and, in many cases, the two solutions are proposed together. Each proposal approaches the issue from a different angle; the first focuses on the legal classification of companion animals, and the second on the expansion of accepted tort recovery. This Comment advocates for the use of both solutions to allow human companions to recover loss of companionship damages. Used together, these reforms will allow the classification of companion animals in a manner more consistent with societal values, and human companions will receive damages properly compensating them for their loss. However, for the purpose of clarity, these two approaches will be discussed in separate Sections.

---

[170] *See* Seps, *supra* note 9, at 1343 ("[T]he law's treatment of animals differs based on the area of law in which the animal is considered."). On a similar note, in arguing that expanding recovery for the loss of companionship of a companion animal is justified even under a property classification, comparisons can be drawn to the treatment of corporations under U.S. law. The U.S. Supreme Court gave corporations "corporate personality" by deciding that they were "a kind of person and resident of a state" and therefore should receive state citizenship. *See* Huss, *Valuing Man's and Woman's Best Friend, supra* note 1, at 71-72. In *Trustees of Dartmouth College v. Woodward*, Chief Justice Marshall expressed a caveat: "[b]eing the mere creature of law, [a corporation] possesses only those properties which the charter of its creation confers upon it . . . ." 17 U.S. 518, 636 (1819). Similarly, allowing for recovery of emotional damages for companion animals can be restricted solely to that specific purpose, as a creature of statutory or common law. If corporations are viewed as legal "persons"—although technically they are not—then companion animals, though property, can be viewed as entities for which the recovery of emotional damages by their human companions is allowed if they are damaged or destroyed.

## A. *Where Should Change Occur? Advocating for the Legislature*

The first obstacle to both approaches is *how* to make the necessary legal change. However, the answer is quite clear: the change must come from the legislature. While more courts are expressing sympathy for claimants by recognizing the real loss felt by human companions and acknowledging changing social attitudes, legal precedent ties their hands.[171] Scholars noted that "judges are extremely reluctant to adopt any approach that radically contradicts centuries of well-developed jurisprudence."[172] Many opinions expressly state that courts are helpless to extend loss of companionship damages to worthy plaintiffs without proper legal action by their state's legislature.[173] This position is valid for many reasons. The legislature can weigh policy considerations,[174] structure laws that properly address social needs,[175] and speak to opposing arguments[176] when enacting a statute. Statutory action will moreover enact change faster than if made through the judiciary.[177]

---

[171] *See* DeFabritiis, *supra* note 12, at 238, 247-48 ("Recent decisions indicate that the judiciary is ready for the legislature to step in and provide an avenue by which the courts may grant non-economic damages.").

[172] Wilson, *supra* note 13, at 183.

[173] *See* Pickford v. Masion, 98 P.3d 1232, 1235 (Wash. Ct. App. 2004) ("[Plaintiff], with good reason, maintains that [his dog] is much more than a piece of property; we agree. Still, no Washington case has recognized the claims Pickford urges us to find. Such an extension of duty and liability is more appropriately made by the legislature."); *see also* Naples v. Miller, 08C-01-093, 2009 WL 1163504, at *3 (Del. Super. Ct. Apr. 30, 2009) (explaining that these issues are "up to the Legislature, not the Courts"); DeFabritiis, *supra* note 12, at 253 ("Absent action by the legislature, the court [in *Scheele v. Dustin*, 998 A.2d 697 (Vt. 2010)] was left to rely on outdated precedent that categorized a companion animal as property for which the sole measure of damages is its fair market value.").

[174] *See* Livingston, *supra* note 2, at 793-94 ("[T]he legislature is the appropriate body to fashion such a remedy and to weigh the competing policy considerations.").

[175] *See* Wilson, *supra* note 13, at 194 ("Legislatures are . . . able to structure laws around the current needs of society.").

[176] Susan J. Hankin, *Not a Living Room Sofa: Changing the Legal Status of Companion Animals*, 4 RUTGERS J.L. & PUB. POL'Y 314, 389 (2007) ("[L]egislation can . . . address the concerns of those who seem most opposed . . . .").

[177] *See* Root, *supra* note 77, at 448 ("[Such] statutes could preempt the settled case law . . . ."). Furthermore, the legislative path was used to enact wrongful death statutes, another significant shift in tort law. *See* Goldberg, *supra* note 3, at 59 ("[A] liability expansion of this magnitude should be made through legislatures, just as with wrongful death acts for spouses and children.").

### B. *A Special Status of Companion Animals: Creating a Unique Semi-Property Classification*

#### 1. A New Semi-Property Classification

The first popular solution encouraged by those supporting the recovery of loss of companionship damages to human companions involves replacing the legal property status of companion animals with a new classification.[178] Proponents argue that the law should reflect society's recognition of companion animals as sentient, emotive, and capable of forming real bonds with their human companions.[179] Therefore, companion animals deserve to be separated from other forms of personal property to reflect these unique characteristics.[180]

Most scholars supporting this line of thought propose to classify companion animals as a special, distinct segment of legal property. While the name of the new classification may vary—from "companion animal property"[181] to "sentient property"[182] or "inimitable property"[183]—the category recognizes what makes companion animals different from other

---

[178] Proponents of this solution believe that "property" is an inadequate and incorrect categorization of companion animals because it fails to take into account the relationship between the animal and the human companion and the value the human companion places upon the animal. *See* Rabideau v. City of Racine, 627 N.W.2d 795, 798 (Wis. 2001) ("Labeling a dog property fails to describe the value human beings place upon the companionship that they enjoy with a dog." (internal quotation marks omitted)). The property classification essentially compares a companion animal to any other piece of personal property—considering it no more or no less than a table or a chair. *But see id.* ("A companion dog is not a fungible item, equivalent to other items of personal property. A companion dog is not a living room sofa or dining room furniture.").

[179] Sonia S. Waisman & Barbara R. Newell, *Recovery of "Non-Economic" Damages for Wrongful Killing or Injury of Companion Animals: A Judicial and Legislative Trend*, 7 ANIMAL L. 45, 55 (2001). As mentioned in previous Parts, many human companions see their companion animals as family members. *See* Seps, *supra* note 9, at 1370 (describing custody disputes and tort cases concerning companion animals).

[180] Hankin, *supra* note 176, at 377; *see also* Wilson, *supra* note 13, at 187 ("Companion animals' unique qualities and unique ability to straddle the line between family member and chattel require[] a unique classification in property law . . . ."). Furthermore, altering the classification of companion animals will "help to make sense of [the minority] judicial and legislative trends that have been emerging in the past decade or more." Hankin, *supra* note 176, at 380.

[181] Hankin, *supra* note 176, at 379.

[182] *Id.* at 385-86 (reviewing one definition of sentient property: "any warm blooded, domesticated nonhuman animal dependent on one or more humans for food, shelter, veterinary care, or compassion and typically kept in or near the household of its owner, guardian, or keeper" (internal quotation marks omitted)); *see also* Sullivan & Vietzke, *supra* note 19, at 44 ("Sentient property has the capacity to feel pain . . . .").

[183] Wilson, *supra* note 13, at 170-71.

types of property.[184] This includes taking into account their "dependence on their human owners, their capacity to suffer if mistreated or neglected, and the bonds that we form with [them] and that they form with us."[185]

One of the most important questions involving this unique property classification is which animals will fall within its reach. Tennessee's T-Bo Act covers only domesticated dogs and cats and has been criticized for the seemingly arbitrary line it draws between these companion animals and others.[186] The Animal Legal Defense Fund takes a more inclusive approach, defining companion animal as a "warm-blooded, domesticated nonhuman animal" that depends on a person for "food, shelter, veterinary care, or companionship."[187] Nevertheless, many proponents still limit their semi-property classifications to dogs and cats,[188] perhaps to diffuse oppositional arguments claiming the new classification is too expansive and would lead to extreme results.

### 2. Oppositional Arguments and Responses in Rebuttal

As with any proposal for change, a new semi-property classification for companion animals has its critics. This subsection will address common arguments against a new property status for companion animals and will respond to them.

First, opponents argue that the current property classification is the correct categorization of companion animals under the law. Over a century's worth of precedent reflects that, under common law, animals are classified as property. As the Indiana Court of Appeals noted in *Lachenman v. Stice*, "[h]owever unfeeling it may seem, the bottom line is that a dog is personal property . . . ."[189] The law has consistently treated all animals as property; to change the legal status of only some animals would result in undesirable and inconsistent treatment of the same species of animal depending on the

---

[184] *See* Hankin, *supra* note 176, at 381 ("Creating a new legal category for companion animals . . . recognizes their important differences from inanimate property . . . .").

[185] *Id.* at 379.

[186] *See* Agorianitis, *supra* note 61, at 1467-68 ("While it is true that dogs and cats are the most common type of companion animal, the statutory limitation of the definition of 'pet' is an arbitrary distinction that wrongfully excludes [other] relationships . . . ."); *see also* Root, *supra* note 77, at 448 ("The statute should include a broader definition of 'pet' because humans can form companion relationships with animals besides dogs and cats, including birds and rabbits.").

[187] Sonia S. Waisman, *Non-Economic Damages: Where Does it Get Us and How Do We Get There?*, 1 J. ANIMAL L. 7, 20 (2005).

[188] *See* Hankin, *supra* note 176, at 386 (proposing a "companion animal property category" limited to dogs and cats).

[189] 838 N.E.2d 451, 467 (Ind. Ct. App. 2005).

situation.[190] Furthermore, opponents argue that such a change will interfere with the scientific research community's ability to use these species of animals in their research.[191]

In rebuttal, proponents of a new classification for companion animals argue that the property classification is outdated and does not accurately reflect the way human companions and society in general view companion animals.[192] Differential treatment of animals in specific legal contexts is both commonplace and desirable.[193] Currently, there are certain U.S. laws that provide differential treatment to some animals based on their species, while other laws treat the same animal species differently depending on circumstance.[194] Distinctive laws are applied to wild animals, livestock, companion animals, and animals used for research.[195] For example, the Animal Welfare Act includes different provisions and restrictions depending on whether an animal is used in research, as livestock, or as a pet.[196] Moreover, changes to the property classification of companion animals can be written in a way to only impact domesticated, household pets, and not members of the same species kept and used for research.[197] Creating a legal classification that gives certain animals a different status and protection in certain situations is not out of the ordinary.

Second, opponents warn that any progressive development away from the strict property classification of companion animals is the first step towards granting companion animals a "legal status akin to personhood," a

---

190  *See* Seps, *supra* note 9, at 1340 ("The law attempts to maintain consistency in its treatment of all animals as property . . . .").

191  *See* Hankin, *supra* note 176, at 389 (arguing, in rebuttal, that narrowly defining the change to the status of companion animals could alleviate opposition from the research community).

192  *See id.* at 377, 379–80 ("A separate legal category for companion animals has both intuitive appeal and would better reflect the way in which we value companion animals in our society."); Schwartz & Laird, *supra* note 17, at 235 (emphasizing the unique value humans place on companion animals); Kirk, *supra* note 33, at 129 ("The law must acknowledge that for many people losing a pet is emotionally devastating.").

193  *See* Seps, *supra* note 9, at 1340 ("Different laws apply to different animals based on their categorization as wild animals, livestock, research animals, or pets."). *See generally* Hankin, *supra* note 176.

194  *See* Seps, *supra* note 9, at 1340 ("Different categorization of animals, and thus the application of laws to different animal groups, is based on humanity's relationship with the animals.").

195  *See id.* ("[A]nimal torture laws do not apply to the treatment of wild animals while hunting, fishing, or trapping.").

196  *See id.* ("In addition, specific laws apply to the killing of livestock, whereas other laws exit that govern the killing of pets in shelters.").

197  Of course, this argument depends on the specific language used in the new semi-property classification of companion animals. *See supra* subsection V.B.1. Other issues surrounding animal research are beyond the scope of this Comment.

situation challengers strictly oppose.[198] Strengthening this position, some proposals recommend the law should grant a narrow class of animals personhood status,[199] and the relationship between a human and a companion animal should be treated similarly to a custodial parent–child relationship.[200]

However, classifying companion animals as "semi-property" will not bring such dramatic results. As mentioned in Section V.A., changes to the property status of companion animals should be effectuated by state legislatures, not through the courts or common law. This way, legislatures can specifically clarify which companion animals are covered, what protections they will receive, and under what circumstances they can be legally classified as semi-property. Acting through the legislature will guarantee that the new legal classification reflects societal values and addresses policy concerns, including those voiced by the opposition. The legislature can also ensure that companion animals are not given "personhood" status or other rights normally granted only to human beings.

### C.  *A New Subset of Loss of Companionship Damages Claims*

#### 1.  Description of a New Recovery Statute

A second proposal looks to expand tort law to allow human companions to recover loss of companionship damages. To do so, advocates suggest state legislatures should follow the lead of the Tennessee T-Bo Act and enact statutes that expressly expand loss of companionship damages to cover injured or killed companion animals. To create a successful statute, a legislature must first address questions such as who can sue and for what acts, which animals are covered, what factors should be analyzed in deciding the financial award, will there be a cap on damages and what should it be, and will there be any exceptions? This subsection will offer answers to these questions.

First, the statute should expressly limit its application to specific individuals. In many cases, a companion animal is a "family pet" who bonds with multiple family members. In order to eliminate the likelihood of

---

[198]  *See* Hankin, *supra* note 176, at 381 (noting that some advocate that animals *should* have a status analogous to people); *see also* Agorianitis, *supra* note 61, at 1466 ("One of the biggest concerns with the abrogation of animals' status as property has been the idea that the elimination of that status will lead to granting animals independent rights as individuals . . . .").

[199]  *See* Seps, *supra* note 9, at 1369 (confining those animals the law should treat as persons to "anthropomorphic pets").

[200]  Huss, *Valuing Man's and Woman's Best Friend*, *supra* note 1, at 69.

repetitive claims and excessive damages awards,[201] some have argued that only one claimant should be able to claim loss of companionship damages either by representing himself or herself (if he or she is the sole owner of the companion animal or the household does not include other human companions) or, in the case of a family, as a "family unit."[202]

Next, the statute would need to clarify which outcomes and acts would occasion loss of companionship damages. The range of options includes injuries not claiming the life of the pet, injuries resulting in death, or the killing of the companion animal (as well as negligent or intentional acts). For example, the T-Bo Act only covers companion animals that were killed or sustained injuries resulting in death,[203] while other proposed statutes allow for recovery for injuries that do not result in death.[204] Most believe recovery should apply to both negligent and intentional acts,[205] while some demand additional requirements for negligence or gross negligence when "the [injurious or fatal act] . . . occur[red] on the property of the deceased pet's owner or caretaker, or while under the control and supervision of the deceased pet's owner or caretaker."[206]

Next, the statute must identify which animals are to be considered "companion animals." As discussed in subsection V.B.1, many statutes either limit the category of recoverable companion animals to just dogs and cats[207] or warm-blooded, domesticated nonhuman animals dependent on their owners,[208] to the exclusion of livestock or farm animals.[209]

---

[201] A popular oppositional argument is that multiple claimants will sue for a singular event involving the same companion animal causing an increase in court caseloads and excessive overcompensation. *See* Livingston, *supra* note 2, at 843 (mentioning the concern that "in a single family several claimants will come forward and seek noneconomic damages, . . . resulting in possible overcompensation").

[202] *See* Chapman, *supra* note 108, at 222 ("[T]he family unit . . . shall recover as one companion animal owner . . . ." (internal quotation marks omitted)).

[203] TENN. CODE ANN. § 44-17-403(a)(1) (West 2014); *see also* Roukas, *supra* note 2, at 57 (proposing legislation allowing for recovery only if an animal is killed or its injuries result in death).

[204] *See* Chapman, *supra* note 108, at 223-24 (proposing a model statute for recovery). Others believe recovery should be limited to only those injuries that are "severe." *See* DeFabritiis, *supra* note 12, at 264 ("[A]ctionable conduct should include both intentional and negligent acts or omissions that result in the severe injury or death of a companion animal.").

[205] DeFabritiis, *supra* note 12, at 264.

[206] Roukas, *supra* note 2, at 57; *see also* Chapman, *supra* note 108, at 223 (requiring the same criteria for negligent action). The T-Bo Act also includes a similar provision. *See* TENN. CODE ANN. § 44-17-403(a)(1).

[207] TENN. CODE ANN. § 44-17-403(b); *see* Chapman, *supra* note 108, at 202 ("[R]ecovery should be limited to those animals that are traditionally kept and recognized as companion animals, and which are capable of both giving and receiving affection—namely cats and dogs.").

[208] DeFabritiis, *supra* note 12, at 264.

Furthermore, if damages for the loss of companionship of a companion animal were allowed, how would a court decide if the plaintiff deserved recovery, and for what amount? While guidelines would help courts apply the law, claims would need to be viewed on a case-by-case basis to determine the nature of each particular animal–human relationship.[210] Since the theory behind recovery is that human companions suffer a real loss of companionship when their companion animal dies, plaintiffs will first have to sufficiently show that they suffered a legally recognizable loss due to the injury to or death of their companion animals.

Many suggest that courts ought to require extensive testimony on the companionship between the plaintiff and the companion animal sufficient to establish the bond that existed between the two.[211] Plaintiffs should introduce evidence on the nature of the relationship,[212] including testimony on its duration, any special training or distinctive uses of the animal, the animal's unique personality, the animal's participation in family activities, and the general family-type attachment to the animal.[213] The court should also take note of special circumstances enhancing the human companion's dependence on the animal and the human–companion animal bond. For example, the plaintiff in *Mercurio v. Weber* purchased her companion animals to provide comfort and companionship after she lost her husband on September 11.[214] Similarly, in *Morgan v. Kroupa*, the court emphasized how

---

[209] However, some argue that drawing the line at farm animals is also arbitrary as an increasing number of people keep farm animals as pets. *See* Goldberg, *supra* note 3, at 48 ("[W]ith many communities increasingly permitting farm animals as pets, drawing a line even broadly at companion animals can be exceedingly difficult."). Susan L. Hankin, in *Not a Living Room Sofa*, proposes a solution to this problem. Hankin suggests that "companion animals" should include only defined species, initially including only cats and dogs. *See* Hankin, *supra* note 176, at 386-87. However, the definition of "companion animal" would also include a mechanism to add other species under its label if certain criteria are met. *Id.*

[210] *See* Wilson, *supra* note 13, at 193 (noting the process courts use for valuing pets after their injury or destruction "will be . . . judged on a case-by-case basis"); *see also* Seps, *supra* note 9, at 1370 ("[C]ourts should consider the circumstances of each pet-owner relationship . . . .").

[211] *See* Lynn A. Epstein, *Resolving Confusion in Pet Owner Tort Cases: Recognizing Pets' Anthropomorphic Qualities Under a Property Classification*, 26 S. ILL. U. L.J. 31, 46-47 (2001) ("Courts should demand to hear testimony as to the companionship value of a particular pet."); *see also* Martin, *supra* note 40, at 951-52 ("[A] court must be cautious of inviting frivolous or fraudulent claims . . . [and thus] extensive proof . . . should be required of plaintiffs.").

[212] *See* Livingston, *supra* note 2, at 837 (recommending plaintiffs to "establish the depth and duration of their relationship with the decedent and the specific ways in which they were connected to the decedent and are now deprived of his/her companionship and society").

[213] *See* Wilson, *supra* note 13, at 194 (listing a variety of factors courts could consider with these claims).

[214] No. 1113/03, 2003 WL 21497325, at *1 (N.Y. Dist. Ct. June 20, 2003).

the plaintiff had his dog since he was a puppy.[215] Courts must be confident of the degree to which a plaintiff suffered grief and loss to ensure that the injury is as severe as the plaintiff claims.[216]

Another important inquiry involves capping damages awards. Many advocate for a cap on loss of companionship (or other emotional) damages to guarantee uniform awards, prohibit excessive recovery or jury over-sympathy, match recovery to the real loss at hand, and pay respect to the belief that the loss of a companion animal does not validate awards equivalent to the loss of a spouse, child, or parent.[217]

While most advocates agree damages should be limited, there is little consensus on what the exact cap should be. Proposals for a statutory cap on emotional or noneconomic damages have suggested $15,000,[218] $25,000,[219] and $100,000 cap amounts.[220] The most notorious statute allowing for loss of companionship damages, the T-Bo Act, caps noneconomic damages for the loss of "expected society, companionship, love and affection" at $5000.[221] Advocates for increased damages awards argue low caps, like the T-Bo Act's cap, will "detract lawyers from accepting cases,"[222] are not well thought-out (given the high cost of litigation),[223] and do not appropriately punish the defendant or compensate the plaintiff.[224]

Next, should specific individuals be exempt from the reach of such statutes? Veterinarians are major opponents of noneconomic damages recovery, and rightfully so, as allowing it would dramatically increase financial verdicts against them and animal hospitals for veterinary malpractice or negligence. Veterinarians also argue that such a change would negatively impact pet owners because veterinarians would be forced to

---

215  702 A.2d 630, 631 (Vt. 1997) (emphasizing the duration of the relationship).

216  *See* Chapman, *supra* note 108, at 215 ("[L]egislatures can . . . require a high burden of proof to insure that plaintiffs' injuries are actually as severe as they may claim.").

217  *See* Livingston, *supra* note 2, at 827-28 ("A cap would [] send a message that although the human-animal bond is worthy of significant compensation . . . the bonds among humans are [still] at the heart of our existence and social organization.").

218  Chapman, *supra* note 108, at 223.

219  Roukas, *supra* note 2, at 57.

220  *See* Martin, *supra* note 40, at 953 (citing a 2003 Colorado bill capping loss of companionship damages at $100,000).

221  TENN. CODE ANN. § 44-17-403(a)(1), (c), (d) (West 2014).

222  Wilson, *supra* note 13, at 195.

223  Root, *supra* note 77, at 448 (arguing that a cap of $4000 for noneconomic damages is "extremely low considering the amount of damages awarded in modern courts and because of high litigation costs").

224  *See* Chapman, *supra* note 108, at 214-15 ("[J]uries and courts are able to assess damages awards that reflect the culpability of the defendant, and therefore, they can limit, or 'cap,' the damages as appropriate.").

change practices, perform "defensive medicine," and potentially increase prices to account for liability costs and increases in veterinary insurance.[225] Therefore, opponents of these laws advocate for the complete exemption of veterinarians from liability.[226] The T-Bo Act explicitly states its inapplicability to licensed veterinarians in professional negligence actions as well as to not-for-profit organizations and government entities and employees acting for the public health or animal welfare.[227] Deciding which individuals or entities should be exempt and under what conditions is another task best suited for legislatures.

### 2. Oppositional Arguments and Responses in Rebuttal

Expanding tort law recovery to allow the recovery of loss of companionship damages for the injury to or death of a companion animal is not without opposition. One of the most common arguments against such expansion rests on the idea that if damages for loss of companionship are awarded for certain companion animals, they will soon be available for other animals as well.

If we are to allow recovery for an injured or killed dog or cat, why not also allow it for a rabbit, hamster, snake, or lizard?[228] In holding that a plaintiff could not recover emotional distress damages for her deceased dog, the Supreme Court of Wisconsin warned that "[h]umans have an enormous capacity to form bonds with dogs, cats, birds, and an infinite number of other beings that are non-human. Were we to recognize a claim . . . [here], we can find little basis for rationally distinguishing other categories of animal companion."[229] Bringing the argument further, what about domestic

---

[225] Huss, *Valuation*, *supra* note 48, at 531; *see also* Schwartz & Laird, *supra* note 17, at 261 ("As a result of the increasing exposure of veterinarians to liability, the costs of veterinary insurance are likely to rise.").

[226] One author suggests exempting veterinarians from liability for professional negligence but not for gross negligence. Chapman, *supra* note 108, at 221.

[227] TENN. CODE ANN. § 44-17-403(e) (West 2014). Other proposed statutory schemes include language similar to that found in the T-Bo Act. *See* Chapman, *supra* note 108, at 224 (proposing a model statute with a provision, similar to the Tennessee statute, which explicitly excludes its application to not-for-profit organizations and government agencies or employees acting to benefit public health or animal welfare but does not include veterinarians as an exempt class of individuals).

[228] *See* Chapman, *supra* note 108, at 216 ("[I]f courts allow recovery for injured cats or dogs, then they will have to allow recovery for injured turtles, fish, squirrels or other animals.").

[229] Rabideau v. City of Racine, 627 N.W.2d 795, 799 (Wis. 2001). The court asserted that public policy rests on the side of denying emotional recovery, questioning how lines would be drawn concerning who could receive damages as a human companion and what species of animals would be permitted. *Id.* at 802 ("[T]he public policy concerns . . . compel the conclusion that . . . Rabideau cannot maintain a claim . . . .").

farm animals? Opponents contend that the fair market standard is the proper form of recovery for animals whose worth is primarily economic.[230] If recovery for companion animals were to be based on sentimental value, then recovery for *all* animals should be based on sentimental value and this standard would incorrectly remedy owners of domestic farm animals.

In rebuttal, proponents argue that laws limiting recovery to certain species of companion animals reflect the views of society and public policy and therefore would not be expanded unless further legislative action was deemed necessary.[231] In essence, the legislature would act as a gatekeeper, deciding whether public policy and societal values dictate expanding the definition of "companion animal" to include a greater number of species. Without further legislative action, animals with primarily economic worth, like domesticated farm animals, would still be evaluated under the fair market value standard. However, "[s]imply because people can form bonds with an infinite number of other beings *does not mean* that plaintiffs should be prohibited from recovering [for certain animal relationships]."[232]

On a somewhat similar note, what effect would opening the doors to loss of companionship damages for companion animals have on recovery for other inanimate forms of personal property?[233] Opponents argue that allowing recovery for loss of companionship damages for companion animals legally classified as property under the law would mean that plaintiffs will soon be able to recover such damages for other lost or destroyed property items holding sentimental or emotional value, such as heirlooms.[234]

---

230 *See* Huss, *Valuation*, *supra* note 48, at 533 ("The value of food producing animals appears to be adequately measured under the current system."); *see also* Livingston, *supra* note 2, at 802-03 ("[M]any domestic animals, such as cattle, sheep, and chickens, are still valued primarily for their economic worth . . . .").

231 *See, e.g.*, Chapman, *supra* note 108, at 216 (noting that this issue can be addressed by defining the animals covered by the statute).

232 *Id.* at 202 (emphasis added) (internal quotation marks omitted).

233 *See* Mark Sadler, Comment, *Can the Injured Pet Owner Look to Liability Insurance for Satisfaction of a Judgment? The Coverage Implications of Damages for the Injury or Death of a Companion Animal*, 11 ANIMAL L. 283, 287 (2005) ("The rationale for [the reluctance to award damages for emotional distress] has been based upon a fear that recognition of these damages would open unlimited possibilities with regard to other items of personal property.").

234 *Cf.* Mercurio v. Weber, No. 1113/03, 2003 WL 21497325, at *1 (N.Y. Dist. Ct. June 20, 2003) ("If plaintiff could recover for the emotional distress of losing her dog, such logic could be extended to allow recovery for emotional distress caused by the destruction of other sentimental items like family heirlooms, class rings or old pictures."). In fact, a few states have created a "property law exception" allowing for the recovery of sentimental value for destroyed heirlooms and memorabilia. Goldberg, *supra* note 3, at 53. The theory of recovery is based on the idea that "unlike any other type of personal property, heirlooms and memorabilia never had a market value . . . and [are] kept only for sentimental reasons, and cannot be replaced with anything

In rebuttal, proponents of recovery argue that heirlooms and other forms of personal property are highly distinguishable from companion animals and cannot justifiably be compared because such objects are nonliving, cannot show love, affection, and emotion, and cannot respond to human stimulation.[235] In 2013, the Supreme Court of Texas addressed this issue in *Strickland v. Medlen*, holding that it would neither overrule the state's narrow heirloom exception nor "broaden it to pet-death cases."[236] The Court listed differences between heirlooms and companion animals. It determined that the fondness for an heirloom is "sentimental," while the attachment to a companion animal is "emotional" and that the reasons behind the attachment to the object differ.[237] Highlighting these differences, proponents argue that expanding loss of companionship recovery to encompass companion animals will not impact the law's view of destroyed heirlooms.

Next, opponents of recovery argue that expanding loss of companionship damages is undesirable because it would allow for a greater recovery for a plaintiff whose claim involved the loss of a companion animal than a plaintiff whose claim involved the loss of a human relative. The extension of loss of companionship recovery for the loss of a child and parent is still fairly new and not universally recognized.[238] Because many filial relationships are not recognized under tort law, opponents are left

---

similar." *Id.* Courts have therefore valued these items of property under the "value to the owner" theory. *See* Schwartz & Laird, *supra* note 17, at 242 (noting that for certain items without market value, such as heirlooms, a better method of valuation would be calculating the value to the owner).

[235] *See* Corso v. Crawford Dog & Cat Hosp., Inc., 415 N.Y.S.2d 182, 183 (N.Y. Civ. Ct. 1979) ("An heirloom . . . is merely an inanimate object and is not capable of returning love and affection. It does not respond to human stimulation; it has no brain capable of displaying emotion . . . But a dog—that is something else."); *see also* Martin, *supra* note 40, at 955 ("[I]t is possible to meaningfully distinguish pets from other forms of personal property . . . .").

[236] 397 S.W.3d 184, 192 (Tex. 2013). *But see* Squires-Lee, *supra* note 7, at 1076 ("Some courts that have valued companion animals appropriately have drawn an analogy to the common law regarding especially valuable personal property with no calculable market value, such as a wedding album or family heirloom, to hold that the intrinsic value of a companion animal to his or her guardian is the proper measure of damages.").

[237] *See Strickland*, 397 S.W.3d at 190 ("Pets afford here-and-now benefits—company, recreation, protection, etc.—unlike a passed-down heirloom kept around chiefly to commemorate past events or passed family members.").

[238] *See* Agorianitis, *supra* note 61, at 1459-60 ("[S]ome courts have extended the concept of loss of companionship to include recovery based on such other relationships as parent and child."); *see also* Waisman & Newell, *supra* note 179, at 50 ("Before 1977, no jurisdiction in the United States recognized common law loss of parental consortium as a viable claim or element of recoverable damages . . . . By early 1997, a total of sixteen state courts had recognized a child's claim for loss of parental consortium.").

uncomfortable with the idea of expanding loss of companionship to cover companion animals before covering these other relationships:

> [W]e do not believe it reasonable to expand tort law to allow a pet owner to recover emotional distress or loss of companionship damages when such damages cannot be recovered for . . . close human friends, siblings, and nonnuclear family members such as grandparents, grandchildren, nieces, nephews, aunts, and uncles.[239]

Opponents view the bonds a person forms with a companion animal as inferior to those one forms with another human being. Why, then, should the law deem the inferior relationship more worthy of recovery?

While opponents raise a very strong argument here, others argue that those who lose a companion animal grieve similarly to those who lose a close family member.[240] The death of a companion animal is distressing to the point that advocates argue "most animal guardians who have bonded with their companion animals experience intense grief at the death of the[ir] companion animal[]."[241] To a mourning human companion, the relationship with his or her beloved animal is not "inferior." Furthermore, advocates for the expansion of loss of companionship recovery to human companions should not be perceived as opposing the idea that other human relationships also deserve greater respect under U.S. tort law. Proponents' theories support the general idea that the law should recognize real, emotional connections and bonds between two living beings—animal or human. By bringing the mistreatment and devaluation of animal–human relationships under the law to the legislature's attention, proponents may also trigger the legislature to rethink its view on traditional familial relationships and, for example, extend loss of companionship recovery to human relationships not already covered.

Opponents' next argument warns that allowing for such a recovery will cause a flood of claims into the court system, including fraudulent and frivolous claims.[242] In rebuttal, proponents argue that courts can use a variety of measures to guarantee that claims are legitimate and that the recovery matches the injury. For example, courts could place a high burden of proof on the plaintiff to show a sufficient bond with the injured or

---

239 Kaufman v. Langhofer, 222 P.2d 272, 279 (Ariz. 2009).
240 *See supra* notes 11–12 and accompanying text.
241 Squires-Lee, *supra* note 7, at 1069 (explaining that the grieving process includes "feelings of denial, anger, [and] depression").
242 *See* Agorianitis, *supra* note 61, at 1464 (calling this the "floodgates" argument); *see also* Martin, *supra* note 40, at 951 ("[A] court must be cautious of inviting frivolous or fraudulent claims . . . .").

deceased animal and the duration and depth of the relationship.[243] Furthermore, this fear is unfounded because only a minimal number of plaintiffs pursue such claims to begin with.[244] Creative solutions could also lessen any potential overburdening of the courts; claims could first filter through a form of alternative dispute resolution or mediation and only if such a process failed would parties be able to litigate a civil action.[245]

Finally, opponents argue that an expansion of damages to cover the loss of companionship of a companion animal unfairly burdens the tortfeasor.[246] Some suggest that tortfeasors will be forced to pay "extraordinary and unrealistic" judgments, disproportionate to their degree of fault,[247] and that such an outcome is "unfair."[248] Loss of companionship, like other emotional damages involving sentimental value, is "inherently subjective, easily inflatable, and potentially astronomical," and therefore must be excluded from the calculation of tort damages.[249]

In response, proponents argue that since tort law is guided by the concepts of just compensation for victims and the requirement that a tortfeasor should "pay for all the damages proximately caused by her conduct," awards should (and will) match the egregiousness of the defendant's actions and the plaintiff's loss suffered.[250] If a defendant is found civilly liable for the injury to or death of a companion animal, he

---

[243]  See *supra* subsection V.C.1 for a full discussion.

[244]  See Chapman, *supra* note 108, at 217 ("[T]here is little evidence to support [the floodgate argument] because only a handful of animal owners have pursued this type of claim."); *cf.* Seps, *supra* note 9, at 1367 ("[L]itigation has not spiraled out of control from the time when courts first began permitting awards of emotional damages for harm to humans.").

[245]  See Chapman, *supra* note 108, at 220, 222 (proposing a model statute requiring owners to assert claims first through alternative dispute resolution); *see also* Huss, *Valuation*, *supra* note 48, at 549 ("Given the emotional nature of a claim[,] . . . mediation could play an essential role in reducing the number of claims that are litigated.").

[246]  See Chapman, *supra* note 108, at 215 (mentioning the opponents' fear that "allowing non-economic valuation of pets would overburden the tortfeasor").

[247]  See Kaufman v. Langhofer, 222 P.3d 272, 278 (Ariz. 2009) (citing other courts' reasoning in refusing to award emotional damages to plaintiffs); *see also* Livingston, *supra* note 2, at 834-35 (listing objections to expanding recovery including the "imposition of damages awards disproportionate to a tortfeasor's fault").

[248]  See Chapman, *supra* note 108, at 203 (describing a court's reasoning that "it would be unfair to place a large financial burden upon a negligent defendant").

[249]  Schwartz & Laird, *supra* note 17, at 242.

[250]  Squires-Lee, *supra* note 7, at 1062, 1085 ("[V]aluing accident costs accurately promotes efficient—and lower—levels of consumption, and as a result, fewer accidents occur."); *see also* Boxberger, *supra* note 13, at 142 (naming "compensation for people's injuries" as one main objection of tort law).

must pay the damages as pronounced by the factfinder.[251] Furthermore, many proponents of recovery agree that damages can and should be capped by the legislature.[252] Therefore, damages for loss of companionship will never exceed what public policy and societal values deem acceptable.

## CONCLUSION

Every day citizens turn to the law and the courts for redress from the harms they have suffered. In cases surrounding an injury to or the death of a companion animal, human companions look to tort law to fulfill its purpose: to justly compensate victims for their injuries.[253] However, the system fails those it was created to serve. Because companion animals are classified as property and loss of companionship claims cover only specific human relationships, human companions are not able to recover the true damages sustained for their loss. For many, the loss of a pet is the loss of a best friend, a family member, and a true companion. The refusal to allow recovery of damages for the loss of companionship leaves plaintiffs incomplete.

Fortunately, a minority position advocating for changes to the strict rules of companion animal classification and valuation and the expansion of loss of companionship recovery is growing in the United States. The changes proponents of this view advocate for are rational and in line with changing societal beliefs. Part IV discussed arguments reinforcing the minority position and Part V covered two reasonable changes to the law that would allow for a new classification of companion animals and a statutory scheme providing for loss of companionship damages to human companions. Only time will tell whether courts and legislatures will increasingly acknowledge society's shift in the treatment of human–animal relationships and whether the laws classifying animals as property and those confining loss of companionship damages to specific human relationships will change. For now, those advocates supporting the minority position will continue to fight for proper recognition of human–animal relationships. "To say [a dog] is a piece of personal property and no more is a repudiation of our humaneness. This I cannot accept."[254]

---

[251] *See* Chapman, *supra* note 108, at 203 ("To say that culpable offenders should not be liable for their blameworthy conduct merely because it is a large financial burden hardly seems in line with justice or notions of fairness.").

[252] *Id.* at 215. However, many disagree as to just where noneconomic damages should be capped.

[253] *See* Squires-Lee, *supra* note 7, at 1062 ("Tort, at its most fundamental level, should compensate victims . . . .").

[254] Corso v. Crawford Dog & Cat Hosp., Inc., 415 N.Y.S.2d 182, 183 (N.Y. Civ. Ct. 1979).

APRIL 21, 2020

*U.S. COURTHOUSE,*

*SANTA FE COUNTY.*

*( EFFECTIVE:  MARCH 25, 2020 ITEMIZATION OF DAMAGES: )*

*[USC 02] 21 USC CHAPTER 9:  FEDERAL FOOD, DRUG, &--- (FOOD POISONING PAPERWORK FURNISHED UPON REQUEST.)*

$ 350,000.00

*EMOTIONAL DISTRESS:*

$ 150,000.00

*WRONGFUL DEATH OF A PET: (3/25/20.)*

$ 4.0 MIL.

*(42 U.S.C. SS 1983)*

*ATTORNEY FEES:*

*TOTAL DAMAGES:*

($4,500,000.00)

Help

# Product Tracking & Reporting

**≡≡ UNITED STATES POSTAL SERVICE ®**

| Home | Search | Reports | Manual Entry | Rates/ Commitments | PTR / EDW | USPS Corporate Accounts | February 04, 2020 |

## USPS Tracking Intranet Tracking Number Result



**Price Change 1/26/2020:**
USPS Premium Tracking: USPS will offer a fee-based service to extend the availability of tracking data on domestic competitive products for an additional 6 months up to 10 years. In addition, customers can also request a Premium Tracking Statement via email.

The Manual Entry Acceptance screen will be modified to use the Pricing Engine for all rates calculations. Users will no longer enter fees for Collect on Delivery (COD) and Additional Insurance; instead, users will enter the dollar amount to be collected for COD or the insured value for Insurance.

**Result for Domestic Tracking Number 7019 1640 0000 3085 6178**

Tracking Expires On
January 29, 2022

### Destination and Origin

**Destination**

| ZIP Code | City | State |
|----------|------|-------|
| 72716 | BENTONVILLE | AR |

**Origin**

| ZIP Code | City | State |
|----------|------|-------|
| 875329998 | ESPANOLA | NM |

### Tracking Number Classification

#### Class/Service

| | |
|---|---|
| Class/Service: | First-Class Certified Mail |
| Class of Mail Code/Description: | FC / First Class |

#### Origin / Return / Pickup Address Information

| | |
|---|---|
| Address: | |
| City: | |
| State: | |
| 5-Digit ZIP Code: | 87532 |
| 4-Digit ZIP Code add on: | 9998 |

#### Service Delivery Information

| | |
|---|---|
| Service Performance Date: | Expected Delivery by: Saturday, 02/01/2020 |
| Delivery Option Indicator: | 1 - Normal Delivery |
| Zone: | 05 |
| PO Box: | N |
| Other Information | Service Calculation Information |

#### Payment

| | |
|---|---|
| Payment Type: | Other Postage |
| Payment Account Number: | 000000000000 |
| Postage: | $0.55 |
| Weight: | 0 lb(s) 1 oz(s) |
| Rate Indicator: | Single Piece - Letters |

#### Other Information

| | |
|---|---|
| Firm Label ID: | 5103 0SHG T972 1295 0016 |
| Related Product: | 9590 9402 4342 8190 8667 95 |

Agent Information

Request Internal Premium Tracking Statement

### Extra Services

**Extra Services Details**

| Description | Amount |
|-------------|--------|
| | |

| Description | Amount |
|---|---|
| Certified Mail | $3.55 |

## Events

| Event | Event Code | Event Date | Event Time | Location | Input Method | Scanner ID | Carrier Route | Posting Date / Time (Central Time) | Other Information |
|---|---|---|---|---|---|---|---|---|---|
| DELIVERED | 01 | 02/01/2020 | 08:24 | BENTONVILLE, AR 72712 | Firm Book | IMD 030SHGT972 (non-wireless) | Scanned by route 2712B001 | 02/01/2020 08:45:03 | View Delivery Signature and Address. GEO Location Data Available. Facility Finance Number: 040774. Request Delivery Record. Firm Name: WALMART |
| SORTING/PROCESSING COMPLETE | PC | 02/01/2020 | 07:42 | BENTONVILLE, AR 72716 | System Generated | | | 02/01/2020 07:57:29 | |
| ARRIVAL AT UNIT | 07 | 02/01/2020 | 07:41 | BENTONVILLE, AR 72712 | Firm Book | IMD 030SHGT972 (non-wireless) | Scanned by route 2712B001 | 02/01/2020 07:57:19 | OFD Same Day. PC / OF Reason Code |
| ENROUTE/PROCESSED | 10 | 01/31/2020 | 11:32 | FAYETTEVILLE, AR 72701 | Scanned | DBOSS-005- | | 01/31/2020 11:36:06 | |
| IN TRANSIT TO NEXT FACILITY | NT | 01/30/2020 | 12:54 | | System Generated | | | 01/30/2020 14:09:02 | |
| DEPART USPS FACILITY | EF | 01/30/2020 | 07:50 | ALBUQUERQUE, NM 87101 | System Generated | | | 01/30/2020 14:15:10 | Dispatch Label ID: DS 14 4143 3333 2001 3014 0230 000 |
| ENROUTE/PROCESSED | 10 | 01/29/2020 | 22:54 | ALBUQUERQUE, NM 87101 | Scanned | DBCS-020- | Destined to route 72716 | 01/29/2020 23:58:07 | |
| ENROUTE/PROCESSED | 10 | 01/29/2020 | 22:08 | ALBUQUERQUE, NM 87101 | Scanned | AFCS200-004- | | 01/29/2020 23:11:11 | |
| DEPART POST OFFICE | SF | 01/29/2020 | 16:03 | ESPANOLA, NM 87532 | System Generated | | | 01/29/2020 17:18:04 | Closeout Label ID: CT 13 6305 6000 2001 2917 0524 000 |
| ACCEPT OR PICKUP | 03 | 01/29/2020 | 14:47 | ESPANOLA, NM 875329998 | Scanned | POS | | 01/29/2020 16:19:05 | Facility Finance Number: 342877 |

Enter up to 35 items separated by commas.

Select Search Type: [Quick Search ▾]   [Submit]

Product Tracking & Reporting, All Rights Reserved
Version: 20.2.2.0.55

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ANTHONY R. HICKS

P.O. BOX # 53,

EMBUDO, N.M.

87531

**(b)** County of Residence *RIO ARRIBA COUNTY.*
*(EXCEPT IN U.S. PLAINTIFF CASES,*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

## DEFENDANTS

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

WALMART'S CLAIM SERVICE

P.O. BOX # 14731,

LEXINGTON, KY

14731

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☒ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☒ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☒ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*

Brief description of cause:  FOOD FRAUD PARASITIC INFECTION FED PROC. 1984 FEB; 43 (2): 239-45 / WRONGFUL DEATH OF A PET 42 U.S.C. § 1983.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $   (4.5 MIL.)   (PLUS ATTORNEY FEES: $   )

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

### FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

RECEIVED
UNITED STATES DISTRICT COURT
SANTA FE, NEW MEXICO

MAY 1 4 2020

MITCHELL R. ELFERS
CLERK

ATT: DEPUTY CLRK.
#FRNT
ANTHONY R. HICKS
COMPLAINT
5/14/20